# THE SUPREME COURT

OF

## PENNSYLVANIA.

---

EASTERN DISTRICT, MARCH TERM, 1831,

---

[PHILADELPHIA, MARCH 21, 1831.]

The CORPORATION for the Relief of Poor Distressed Presbyterian, Ministers, &c. *against* WALLACE and others.*

3r    109
36 SC ¹280

A sale by the sheriff of a part of mortgaged premises, under a younger judgment against one claiming title under the mortgagor, exonerates the land sold from the lien of the mortgage, though the mortgage is not yet due, and no default has been made.
In such case, the part of the property not sold by the sheriff remains liable for such propor- tion of the debt due on the mortgage, as should be rated to its comparative value with the whole property mortgaged.

THIS was a *scire facias* on a mortgage issued in this court to *March* Term, 1822, by the plaintiffs against *John B. Wallace* and *Susan* his wife, mortgagors, and *James Hunter, Joseph P. Smith, Charles Stewart's* heirs, *George Pepper*, and *Dorothy* and *Susan Davis*, terre-tenants.

• The counsel of the parties agreed upon a special verdict, which disclosed the following facts.

On the fourth of *September*, 1805, *John B. Wallace*, Esq. and wife, mortgaged the premises described in the *scire facias* as city lots, Nos. 2017, 2018, and 2019, to the plaintiffs, for the payment of four thou- sand one hundred and eighty-seven dollars, fifty-seven cents, on or before the 15th of *March*, 1821, with interest; and the mortgage was

---

* For the report of this case, the editor is indebted to *John K. Kane*, Esq. by whom it was prepared for the press.

recorded on the 5th of *September,* 1805. Interest was paid by him to the 15th of *March,* 1821, but the subsequent interest and the principal remained unpaid, and the mortgage stood up to the present time unsatisfied on the record. On the 24th of *June,* 1823, *Wallace* confessed judgment on the mortgage, but without notice to the terre-tenants. Writs of *levari* and *alias levari facias* issued thereon to *July Term,* 1824, and *July Term,* 1827, in this court, and were returned. A *pluries levari facias* issued to *December Term,* 1828, under which a levy was made, and the premises advertised for sale.

An agreement was then made in the case among the attorneys for the terre-tenants, appointing commissioners, to ascertain among other things, the proportions in which the several premises covered by plaintiff's mortgage should contribute to the discharge of it, and to report to the plaintiff's counsel. On this agreement being made, the plaintiffs stayed proceedings on the *pluries levari.* Before the commissioners, however, the terre-tenants having exhibited their titles, claimed to hold discharged from the plaintiff's incumbrance, and the commissioners therefore made a report.

The terre-tenants all held under a conveyance of the mortgaged premises made by *Wallace* and wife on the 21st of *February,* 1810, to *Gideon Cox* in fee, for a full consideration. Their titles were derived as follows:

No. 1. On the    th day of *February,* 1810, *Cox* conveyed to *Charles Stewart* a part of the premises, consisting of eighteen feet in front on *Market* street, by one hundred and eighty feet in depth, for the consideration of. four thousand and fifty dollars; *Stewart* died leaving heirs, certain of the terre-tenants.

No. 2. On the 6th of *April,* 1812, *Cox* conveyed, for a full consideration, to one *Harris,* a part of the premises consisting of thirty-six feet fronting on *High* street by one hundred feet in depth; which on the 24th of *December,* 1813, was sold by the sheriff under an execution against *Harris* from the District court for the city and county of *Philadelphia,* to *James Hunter* Esqr. for seven thousand six hundred dollars, subject to certain mortgages made by *Cox* and *Harris.* The purchase-money was brought into court by the sheriff, and .distributed upon the report of an auditor, among lien creditors of dates subsequent to the plaintiff's mortgage. *Hunter* afterwards paid off the mortgages made by *Cox* and *Harris,* amounting to seven thousand five hundred dollars.

No. 3. On the 29th of December, 1810, *Cox* conveyed for a full consideration to one *Lewis,* another part of the premises, eighteen by one hundred feet, adjoining the foregoing. *Lewis* afterwards conveyed it to one *Bickley,* and on the 8th of July, 1814, it was sold by the sheriff under an execution against *Bickley,* to one *Fassitt,*—the purchase-money, six thousand seven hundred and fifty dollars, was paid by the sheriff into court, and there distributed among lien creditors of dates subsequent to the plaintiff's mortgage. *Fassitt* afterwards conveyed to *Cresson,* who mortgaged back to *Fassitt* for four thou-

(Presbyterian Corporation *v.* Wallace and others.)

sand dollars, and the premises were again sold by the sheriff under that mortgage on a *levari facias*, on the 17th of *February*, 1830, to *A. B.*

No. 4. On the 5th of *November*, 1816, *Cox* conveyed for a full consideration to *Wallace* a lot of ground, fifty four-feet by eighty feet, lying at the rear of the premises described above as No. 2 and No. 3, and part of the premises included in the plaintiff's mortgage. On the 13th of *March*, 1817, *Wallace* and wife conveyed to one *Brogan* in fee, two lots on *Thirteenth* street, fifty-four feet by forty feet of which, being the rear thereof, was part of the above fifty-four feet by eighty feet, and took two mortgages for the purchase-money, each of three thousand five hundred and eighty-three dollars and thirty-three cents. The mortgages were assigned by *Wallace* to one *Pepper* for a full consideration. *Pepper* sued out writs of *levari*, became the purchaser at the sheriff's sale for three thousand eight hundred and twenty-five dollars, received the sheriff's deeds, but being himself the plaintiff in the execution, paid no money except for the costs.

No. 5. On the 13th of *March*, 1817, *Wallace* and wife conveyed to one *Grugin*, a lot on *Thirteenth* street, adjoining the foregoing, fifty-four feet by twenty feet of which, being the rear thereof, was part of the same fifty-four feet by eighty feet, and covered of course by the plaintiff's mortgage; the consideration being a mortgage for three thousand five hundred and eighty-three dollars and thirty-three cents. On the 7th of *October*, 1818, this lot was sold by the sheriff on an execution against *Grugin*, to *D. & S. Davis*, for two thousand five hundred and seventy dollars, subject to the last-mentioned mortgage. The sheriff paid costs and judgments to the amount of six hundred and sixteen dollars and ninety-three cents, and paid the balance into court, where it was distributed among lien creditors of dates subsequent to the plaintiff's mortgage. *Davis* afterwards paid off the mortgage for three thousand five hundred and eighty-three dollars and thirty-three cents.

No. 6. On the 13th of *March*, 1817, *Wallace* and wife conveyed to one *M'Indoo* a lot on *thirteenth* street, adjoining the foregoing, fifty-four feet by twenty feet of which, being the rear thereof, was part of the same fifty-four feet by eighty feet, and covered of course by the plaintiff's mortgage ; the consideration being a mortgage for three thousand five hundred and eighty|three dollars and thirty three-cents. This lot was afterwards sold by the sheriff on an execution against *M'Indoo*, to one *Stewart* for one thousand five hundred and twenty-five dollars, subject to the last-mentioned mortgage. The sheriff paid costs and judgments to the amount of eight hundred and thirty-one dollars and thirty-six cents, and paid the balance into court, where it was distributed among lien creditors of dates subsequent to the plaintiff's mortgage. *Stewart* afterwards paid off the mortgage for three thousand five hundred and eighty-three dollars and thirty-three cents.

These six parcels together constituted the whole of the premises

(Presbyterian Corporation *v.* Wallace and others.)

covered by the plaintiff's mortgage, and against which their *levari* had issued.

There was no proof that either of the purchasers of any part of the premises had actual notice of the plaintiff's mortgage; nor was there any proof that the plaintiffs had actual notice of any of the *mesne* sales by the sheriff, or of the distribution of the proceeds thereof.

The sheriff's advertisements for the sales made by him, in no instance described the property, according to the description thereof made in the plaintiff's mortgage, *viz.* as city lots Nos. 2017, 2018 and 2019, nor as parcel thereof, or of any or either of them; nor did they indicate the former ownership of the mortgagor, *Wallace;* nor did they mention the premises for sale as part of a larger lot sold by him ; but the several parcels of the entire premises, which were sold by the sheriff, were sold as the property of the respective defendants in the executions by whom they were then owned; each parcel so sold having at the time of sale a three story brick messuage erected thereon ; and each parcel so sold contained such a description in the levy, advertisement, and deed, by distance from the north-east corner of *High* and *Thirteenth* streets, as to indicate its position or location.

The questions submitted to the court upon these facts, were " whether the mortgaged premises aforesaid, or any part thereof, and what part or parts, have been discharged from the lien of the mortgage of the plaintiffs in this suit, and if the said mortgage is a lien on some part or parts only of the mortgaged premises, whether it is so for the whole debt or only for a proportional part of the said mortgage debt."

*Kane, Chauncey* and *John Sergeant* for the plaintiffs, and *E. K. Price, J. P. Norris, Wharton, Tilghman, Wm. Smith* and *J. R. Ingersoll* for the several terre-tenants.

Mr. *Kane* for the plaintiffs.—The leading question in the case may be stated thus : does a sale by the sheriff of a part of mortgaged premises, under a younger judgment rendered against one claiming title under the mortgagor, destroy the lien of a duly recorded mortgage, which is not yet due, on which no default has been made; where there has been no notice of the sale to the mortgagee; and where the public advertisements of the sale, even if known to him, would have given him no information that the premises mortgaged to him, were to be the subject of the sale ?  The only apparent exception to any part of this statement of the question, is the sale of No. 4. by *Pepper* to himself, before default of our mortgagor.  Our argument of the question will, however, apply to this case also.

It is said that this question has been already decided by this court in *Willard* v. *Norris*, at *Sunbury, July,* 1829, 2 *Rawle,* 56.   But,

I. Though the judgment in that case was unanimous, the argument of Judge Tod, who pronounced it, cannot be considered as that of the whole bench, inasmuch as 1. it is at variance with the opinions of the court delivered by Gibson, J. in *Weidler* v. *Farmer's Bank*, 11 *Serg.*

*& Rawle*, 134, by Rogers, J. in *Gilmore* v. *Commonwealth*, 17 Serg. *& Rawle*, 277-8, and by Gibson, C. J. in *Ripple* v. *Ripple*, 1 *Rawle*, 386. 390, only eighteen days before the decision of *Willard* v. *Norris ;* and yet neither of these three decisions was impugned or even referred to in Judge Tod's argument. 2. It is directly opposed to the opinion of the Supreme Court of the *United States* in *Rankin* v. *Scott*, 12 *Wheat.* 179, yet does not refer to or impugn that opinion. Assuming that the case of *Willard* v. *Norris* decides authoritatively only the question which was raised by the record, it is inapplicable to the facts stated in this special verdict, and we are referred back to the law as understood, and for more than forty years settled ; *Levinz* v. *Will*, 1 *Dal.* 435. *Evans* v. *Jones*, 1 *Yeates*, 172, compared with 3 *Sm. L.* 158, 159, *in note ;* which are fully supported and amplified in the opinion delivered by this court in *Lancaster* v. *Dolan*, 1 *Rawle*, 245-6. If then it be law, as was decided in *Levinz* v. *Will*, in 1789, that " the recording of a mortgage amounts to constructive notice to all men, and supercedes the necessity of express personal notice ;" and if it be also law, as was decided in *Ripple* v. *Ripple*, in 1829, that " a purchaser at a sheriff's sale with notice of its incumbrances, takes subject to them ;" it follows as an unavoidable conclusion, that a purchaser at sheriff's sale of mortgaged premises, takes subject to the elder mortgage duly recorded upon them. And that such was the understanding of the bar appears by the agreement for contribution entered into by the defendants' counsel, to prevent a sale under our *levari.*

II. But admitting the opinion of Judge Tod in *Willard* v. *Norris* to be law, and that in general a sale by a sheriff under a junior judgment, discharges the land from the lien of a prior mortgage ; yet this rule of law will not be extended to cases, to which the principles, on which it is founded, can have no application. Now the course of Judge Tod's reasoning in *Willard* v. *Norris* is this :—The prior incumbrance creditor was entitled to claim payment of his incumbrance from a fund in the sheriff's hands ; and as in bankruptcy, a debt proveable, and a debt barred, are convertible terms. The incumbrance creditor had the means of knowing that there was such a fund, to which he might have recourse ; for without notice actual or constructive, no one can be barred of a right, and there can be no constructive notice where knowledge is impossible. If from accident or ignorance, or other cause, he yet made no claim, the sheriff had the same knowledge, for he could ascertain the incumbrances by inspecting the records, and was bound to see the fund properly distributed to those rightfully interested. The argument therefore in *Willard* v. *Norris*, and the doctrine to which it leads, apply, 1st. Only to sales, where money has been paid, and was susceptible of distribution, 2d. Only to incumbrances, which appear of record to have been made by the defendant in the execution, or by some one under whom he claims by title itself of record in the county ; for in all other cases the sheriff has no means of ascertaining the existence of the incumbrance. 3d.

Only to cases where it has appeared by the words of the advertise-ment, or by obvious inference from them, that the property sold is the same with that which was incumbered.   4. Not to cases where the incumbrance covers only a part of the property which has been sold intregrally.   5. Not to cases, where the incumbrance covers more than the property, which has been sold; for, *first*, a creditor having right of recourse to two funds, is not permitted in equity to take from that which is the sole resort of another; and the mortgagee of the entire premises, therefore, not having been permitted to take the fund in the sheriff's hands, inasmuch as it formed the sole resort of the plaintiff in the execution, cannot be said to have been constructively paid by it; and, *secondly*, a creditor even by judgment, may waive his priority of claim on the proceeds of certain property, without extin-guishing his debt or impairing his lien on other property. *Com.* v. *Alex-ander*, 14 *Serg. & Rawle*, 257. 263. GIBSON, C. J.'s opinion in *Bank of Penn.* v. *Winger*, 1 *Rawle*, 295. 301, 302.   6. Not to cases, where from any cause the incumbrances cannot be defined or their amount calculated, as incumbrances with collateral condition of defeasance, *Lyle* v. *Ducomb*, 5 *Binn.* 585, or incumbrances contingent either altogether, or as to amount, which on that account would not be proveable in bankruptcy, 1 *Bac. Abr.* 424, such as annuities for life, *Ripple* v. *Ripple*, 1 *Rawle*, 386, and interlocutory judgments.   7. Not to cases in which the incumbrance creditor is not, at the time of sale, entitled to payment of his debt, such as irredeemable incum-brances, ground rents in fee, and mortgages not due.   A judgment, on which stay of execution has not expired, is otherwise: it is *debi-tum in præsenti* though the law will not aid its compulsory collection till a future day.   A mortgage till the day of payment is for a *debitum in futuro*, and until default contingent besides: time is of the essence of the mortgage contract.   Each of these seven limitations affects either the whole or a part of the sheriff's sales, which are alleged to have di-vested our mortgage; and the cases cited in support of the *fifth*, show that it remains valid for the full amount due on it, and the work of apportioning it belongs to the terretenants.   So modified and limited, the principle of *Willard* v. *Norris* does not apply to our case.   If not so modified, it is at once unconstitutional, unsupported by authority, and at variance with the general opinion of the profession as evi-denced by the practice; unconstitutional, because it impairs the ob-ligation of the mortgage contract, and would divest the rights of an individual by a judicial proceeding, to which he is not a party, of which he has had no notice, and of which he had no possible means of knowledge: Unsupported by authority; for the only two cases cited by Judge TOD, as directly in point, *Com.* v. *Alexander*, 14 *Serg. & Rawle*, 257, and *M'Call* v. *Lenox*, 9 *Serg. & Rawle*, 306. 308. 313, avoid a decision of the principal question, and the *dicta* of the judges intimate the opposite opinion: Opposed to the general senti-ment of the community, as was shown by the act of assembly, which was passed immediately after the decision in *April*, 1830; and op-posed to the universal practice of the profession in this part of the

(Presbyterian Corporation *v.* Wallace and others.)

state at least, which assumed for its basis the immunity of an elder mortgage from divestiture by a sale under a junior incumbrance. This practice is recognized by the agreement of counsel in this case, and it must be kept in view while examining many of the arguments and decisions cited by Judge Tod. The general practice was for the sheriff to sell, if he could, clear of incumbrances: in such case he was bound to pay prior incumbrances, and if the proceeds of sale were adequate, subsequent ones also; and he was therefore entitled to the costs of his searches and to his poundage on the amounts paid. This is the key to the cases in 1 *Browne,* 97. 1 *Binn.* 97. 2 *Dall.* 131. 3 *Binn.* 358. 1 *Serg. & Rawle,* 324. But if the proceeds of the sale were inadequate to pay the prior incumbrances, the conditions could not be complied with, and the sale failed. When, however, it happened, that the defendant before judgment had by contract or conveyance divested himself of any portion of his rights; if he had articled to sell so as to pass an equitable interest; if he had leased and the lease was unexpired, or if he had mortgaged, and the mortgage was not yet payable, (unless, indeed, the creditor chose to accept his money before it was due,) in such case the sheriff never undertook to sell more than the defendant's remaining interest. The practice was simple, advantageous, and never misunderstood.

Mr. *Wharton,* for the terre-tenants.—The question whether a mortgage is discharged by a sale under a judgment subsequent to it in date, may be considered as settled by the case of *Willard* v. *Norris ;* but were it now debateable, we would show that the decision established no new law, overthrew no previous authority, impugned no settled practice, but simply recognized what necessarily grew out of legal provisions existing from the earliest periods of our history.

(The Court informed the counsel that they were willing to hear the question argued as if it were *res integra.*)

Mr. *Wharton.*—The law of mortgages has from the earliest times been essentially different in this state and in *England.* They have uniformly been treated merely as a security or lien upon land for a debt, not as a conveyance of the land. Our ancestors among other bold but salutary innovations, determined that lands should be liable for the payment of debts. In the frame of laws agreed upon in *England,* it was provided, " That *all lands and goods* shall be liable to pay debts, except where there is legal issue, and then all the goods, and one third of the land." (1 *Sm. Laws,* 9.) The acts of 1682, 1688, 1694, extended this to one half of the land; and finally, the act of 1700, (1 *Sm.* 7,) declared, that " all lands and houses whatsoever shall be liable to sale upon judgment and execution." *Lands* being thus assimilated in this point to *chattels,* the same rule would necessarily prevail with respect to the consequences of a sheriff's sale. Now, it is settled, that on a sale of chattels by virtue of a *fieri facias,* all previous liens, even that of a prior execution, are divested. 2 *Tidd,* 916. *Id.* 927. 2 *Bac. Abr.* 721. *Carth.* 419, 420. The reason

given in the last case is applicable and conclusive.   But the Act of 1700 provides expressly, that after the sheriff's sale, the lands, &c. " shall be and remain *a free and clear estate* to the purchaser, his heirs and assigns forever, as fully and amply as ever they were to the debtor."

The Act of 1705 introduced a system of proceeding with respect to mortgages entirely new.   It treats them not as *conveyances* of the land, but as liens or incumbrances merely, and gives a remedy to the mortgagee for the recovery, not of the land itself, but of the debt, by a sale of the land under a *levari facias,* by virtue of which it is to be sold " free from all *other* incumbrances."   That a mortgage has been treated by the courts as a security merely, is shown by the cases of *Dorrow* v. *Kelly*, 1 *Dall.* 142, *Wentz* v. *Dehaven*, 1 *Serg. & Rawle,* 317, *Semple* v. *Burd,* 7 *Serg. & Rawle,* 290, *Schuylkill Nav. Co.* v. *Thoburn,* 7 *Serg. & Rawle,* 419.   In *Scott* v. *Croasdale,* 1 *Yeates,* 75, an early case, it was decided that a mortgage by the husband alone in consideration of a precedent debt was sufficient to bar the wife's right of dower.   A *conveyance* of real estate to trustees for the payment of debts, does not of itself affect the wife's right of dower.   This shows that a mortgage was not looked upon as a *conveyance,* and proves the difference between our local regulations and those of *England,* and other states.   If then a mortgage in *Pennsylvania* be only a security for a debt in the shape of a lien upon the land, the next question is, how such lien is affected by a judicial sale.   Upon principle it would seem, that there could be but one answer to this.   The great object of our law of executions is to get satisfaction for the execution creditor, by a sale of the debtor's property for its full value. Sheriff's deeds convey all the title of the defendant but no more. There is no warranty, and the rule of *caveat emptor* fully applies. Hence, they seldom produce as much as private sales.   It has been the policy of our law to encourage purchasers.   But if they are to buy subject to liens, the price will be materially affected.   It is not possible for the purchaser at sheriff's sale to ascertain the incumbrances previously to the purchase, as in the case of a private sale. Continuing *liens,* therefore, and a full price, are inconsistent.   One must give way.   The paramount object is full price.   The *security* of the incumbrancer is secondary, but not at all inconsistent.   His *lien* is transferred from the *land* to the *fund,* and it will be shown presently, that it is sufficiently attended to.   Then, how stand the authorities with respect to incumbrances or liens?   In *Pennsylvania* the principal, and perhaps, only liens upon land are, 1. Judgments, 2. Legacies charged upon land, 3. Recognizances, 4. Mechanic's Claims, 5. Mortgages.

1. *Judgments.*   It was supposed at one time to be doubtful, whether a sale under a younger judgment destroyed the lien of a prior judgment.   3 *Griffith's Law Reg.* 250, in *note,* shows the opinion of the profession, and the case of the *Commonwealth* v. *Alexander,* 14 *Serg. & Rawle,* 262, settled this point conclusively.

(Presbyterian Corporation *v.* Wallace and others.)

2. *Legacies* charged upon land. This is, perhaps, as strong a case as could be put for the incumbrancer, yet in an early case, it was ruled, that the proceeds of a sheriff's sale were to be applied to the discharge of such a legacy. *Nichols* v. *Postlethwaite,* 2 *Dall.* 131. And it has since been held after full argument, that the lien is discharged by such sale. *Barnet* v. *Washebaugh,* 10 *Serg. & Rawle,* 410.

3. *Recognizances.* The only case under this head is *Gilmore* v. *The Commonwealth,* 17 *Serg. & Rawle,* 276, which decided that the purchaser of property sold by order of the Orphan's Court, took it divested of the lien of a recognizance given to secure the distributive shares, and it was said by the court, that there was no difference between a recognizance and a judgment in this respect.

4. *Mechanic's Claims.* A very recent case places these liens on the same footing with the preceding. *Werth* v. *Werth,* 2 *Rawle,* 151.

5. *Mortgages.* Having shown, that all other liens are discharged by a judicial sale, I proceed to inquire what has been the current of authority with respect to this. *Evans* v. *Jones,* (1 *Yeates,* 172,) cited by Mr. *Kane,* was not a case of *sale,* but of property taken at an appraisement on proceedings in partition in the Orphan's Court. The earliest case of sale is *Febiger* v. *Craighead,* 2 *Yeates,* 42. The evidence given on the trial at *Nisi Prius,* in *Cumberland* county, in that case, shows what was the practice as far back as 1793, in that part of the state.\* The statement by Mr. *Lewis,* of the practice of

---

\* Mr. *Wharton* read the notes of the trial from the MSS. of C. J. Shippen, and has favoured the Reporter with a copy, which is subjoined.

Lessee of Christian Febiger, ⎱
　　　　vs.　　　　　⎰　Nisi Prius. *Cumberland* County, 15th *May,* 1793.
Thomas Craighead.

Mr. *Ingersoll, pro Q.　John Glen* executed a mortgage to the Loan Office ; none of the money secured has been paid. Act of Assembly, Province Laws, 478. Deed shall vest estate in fee in trustees of Loan Office.

Mr. *Duncan, pro D.　John Glen,* the mortgagor, was sued by ———, and judgment and execution.

*Oct.* 1781.　John Scott, ⎱
　　　　vs.　　　⎰　Judgt. and Exn. *Vend. Exp.*
　　John Glen. ⎰

*Nov.* 1782.　Lands were advertised and sold on these executions to *James Davidson. John Boys* v. *James Davidson.* Judgment, execution and sale to *Boys.*
25 *March,* 1783.　Sheriff's deed from *Boys* to *Davis.*
24 *Nov.* 1784.　Sheriff *Postlewait* to *Craighead* as property of *Davis.*
Verdict agreed to be taken for plaintiff upon the point reserved, whether when land is sold under a judgment, and no notice given to the purchaser of a prior mortgage, the purchaser shall hold the land, discharged of the mortgage.

*Davie Hoge,* was formerly sheriff of *Cumberland* county. The usage has been, for thirty years, when the sheriff knew of a mortgage, he sold subject to the mortgage, but when the sheriff had no such knowledge, and there was no mortgage recorded in the county, he sold absolutely, and paid off judgments and mortgages according to their priority. It was considered that when the land was sold absolutely, it discharged all former incumbrances as to the purchaser, and the sheriff looked to the payment of judgments according to their order.

*Timothy Hartley,* Esq. It has been the practice, that when a mortgage was known at

the state as reported by *Yeates,* is entitled to great consideration. The next case is *Keen* v. *Swaine,* 3 *Yeates,* 561, where the court was divided in opinion, but the weight of authority and experience is obviously with the affirmative of the proposition. The doctrine contended for has received further support and sanction in *Petry* v. *Beauvarlet,* 1 *Binn.* 97, *Wall* v. *Lloyd's Ex'rs,* 1 *Serg. & Rawle,* 324, 327, *Stackpole* v. *Glassford,* 16 *Serg. & Rawle.* 163. We have then the evidence of public officers, and the statements of the most eminent professional men with respect to the practice, and decisions of this court from the earliest times, if not expressly determining the point, yet leading inevitably to this result. Then came the case of *Willard* v. *Norris,* which has been followed by *M'Lanahan* v. *Wyant,* 1 *Penn. Rep.* 112. *Finney* v. *Commonwealth, Id.* 240. *Fickes* v. *Ersick,* 2 *Rawle,* 166.

Taking then the case of *Willard* v. *Norris* to be properly adjudicated, it remains to be seen, if the present differs from it in any essential feature, which calls for a different determination. 1. It is said, that the money was not due, and that the plaintiffs could not be compelled to accept it from the mortgagee. On principle this ought not to make any difference. The mischiefs are the same in sheriff's sales. It cannot be said to violate the obligation of a contract to offer money to a creditor before it is due. In bankruptcy this is done, *Cooper's Bank. Law,* 191-2. There is no difference between a mortgage and judgment in this point. In *Commonwealth* v. *Alexander,* 14 *Serg. & Rawle,* 257, the judgment was not payable at the time of sale. But it is not necessary that the money should be paid to the creditor *in invitum.* In *Commonwealth* v. *Alexander,* C. J. TILGHMAN says, that the money may be brought into court, and kept until the creditor is entitled to receive it. Why may not the court invest it? In *Barnet* v. *Washebaugh,* this objection was made, but disregarded. At all events part of this land was sold in 1825, four years after the mortgage became due, and part remains unsold. 2. It was argued, that as only *part* of the land was sold here, as it was not described conformably with the mortgage, nor sold as the property of the mortgagor, the rule in *Willard* v. *Norris* ought not to be applied. Now if the circumstance that *part* only of the land was sold at each sale, is to have any weight, the true question would seem to be, if there was enough raised to pay off the mortgage. Now the first sale produced three times as much as the mortgage, the second more than

---

the time of sale of land under a judgment, the land was generally sold subject to the mortgage, and then the purchaser was to look to the discharge of the mortgage. If the land was sold absolutely, without mentioning a mortgage, it was the business of the sheriff to discharge incumbrances, according to priority, and the purchaser was not to look to it.

Mr. *C. Smith.* It has been the general idea, that it was indifferent to the purchaser whether there were any prior incumbrances or not; that it was the sheriff's duty to see to the discharge of incumbrances, according to their priority.

*Jno. Postlewaite,* former sheriff, has sold land subject to a mortgage, in which case the mortgage money was to be first paid.

enough and so on. Then as to description, 1. It was described sufficiently as to *locality.* 2d. Handbills were placed on the houses. 3d. Advertisements were published in the newspapers. The same objection has been made and overruled in the case of judgments and legacies charged on land. 14 *Serg. & Rawle,* 257, 259. 16 *Serg. & Rawle,* 410. It is said also that the plaintiffs have lost their remedy against the sheriff. If so, then, laches cannot affect this case. It appears, that interest was stopped so far back as 1821. This ought to have put them on inquiry. In 1823 they obtained judgment, and ought to have proceeded against the sheriff. However, this may be, it is settled, that the purchaser at sheriff's sale is not bound to see to the application of the purchase money. *Bank of Pennsylvania* v. *Winger,* 1 Rawle, 302. *Finney* v. *Commonwealth,* 1 *Penn. Rep.* 240-1. Per GIBSON, C. J. As to the act of 1830, it is merely remedial, not declaratory.

Mr. *Price* and Mr. *Tilghman* followed on the same side.

Mr. *J. Sergeant,* for the plaintiffs, contended, that whatever might be the decision in *Willard* v. *Norris,* it left open two questions in the present case, 1. Does the sheriff's sale affect a mortgage not yet due? 2. Does it affect the rights of the mortgagee further than to take off the lien from the land sold?

1. No case, no dictum, no argument has been presented to establish the affirmative of the first question. The mortgage security has been one specially regarded by the legislature: it is placed on the same footing with the public debt, as a mode of investment. And it has always been understood to have the same advantage over legal incumbrances, that it cannot be paid off before the stipulated day. It is not merely to have the same effect as a judgment. Both may be securities; but one only is a lien by contract between the parties. It is a good contract, made for a sufficient consideration, by competent parties; and none but the parties have an interest in it: a contract of pledge, not necessarily as security for the payment of money; it may be for indemnity, it may be for the performance of covenants. Can such a contract be set aside, or the rights of the parties varied, for the purpose of aiding the conflicting interests of others? Can the time, which was an essential element of the contract, part of the consideration moving between the parties, be disregarded? Till the time of payment arrives, the mortgage is a conveyance, and the mortgagee may claim possession: when it has arrived, and only then, the mortgagor is entitled to demand a removal of the incumbrance on payment of the debt. Judgments are general liens; but they are subject to contingencies of various sorts, *Thellusson* v. *Smith,* 2 *Wheat.* 396, and among them, the contingency of legislative intervention. The legislature may properly enough legislate respecting a remedy, and a judgment is nothing more; but a mortgage is a contract, which they cannot touch. One is a security for money, the other, process for the recovery of a debt. A law was necessary to make lands

liable for the payment of judgments, to enable a sheriff to sell them under a judgment. But no law made land liable for a mortgage : it was made liable by the parties. The sheriff on an execution sells the title, the interest of the defendant. What the defendant could have done, the law will do : it will pay off mortgages that are payable by the terms of the contract of mortgage ; but it cannot pay off others. 2. Does a sale of part discharge the rest ? As between mortgagor and mortgagee, this is a mere destruction of their contract, and would confessedly be unjust : the assignee of the mortgagor can only stand in the place of his assignor, and can claim no other rights.

Mr. *J. R. Ingersoll,* for the defendants, contended, that the plaintiffs suffered their claim to sleep so long as to constitute an equity in favour of the tenants. *Moore* v. *Cable,* 1 *Johns. Ch.* 385. *Demarest* v. *Wynkoop,* 3 *Johns. Ch.* 128. 9 *Wheat.* 489. 4 *Johns. Ch.* 551. In a conflict of equal equities the legal title prevails. 1 *Fonblan.* 320. 350. 2 *Fonbl.* 486, and in note. As to the part not sold, the defendant, *Stewart,* has had possession fifteen years and a half; no claim made against him, and no intimation of an existing incumbrance. 1 *Pow.* 103. 2 *Dick* 725. 2 *Bro. Ch. C.* 431. 7 *Ves.* 150. *Matthews on Pr. Ev.* 373. *Finch,* 250. 1 *Ch. R.* 59. In *Taylor* v. *Potter,* 7 *Mass. Rep.* 355, it was decided, that where mortgaged premises had been conveyed to different persons, and one paid the mortgage debt, the mortgage was thereby discharged as to both. A mortgage wants all the dignity of a conveyance : it is not subject as such to the provisions of the statute of frauds, 11 *Johns.* 534 : it may be created, and may be assigned by delivery : on the death of the mortgagor it goes to the executor and not to the heir : a wife is not required to join in it : it may be extinguished without release or other formality. But it is supposed to be above legal control, because it is a contract : and are not all contracts made subject to the existing laws ? A contract is vitiated if it becomes illegal even after it is made. 2 *W. C. C. R.* 276. 12 *Wheat.* 213. Considerations of public policy may even sweep away a contract altogether : such are the cases of the entry upon lands, and the occupation of them by the public, for roads and bridges, &c. In cases like the present, the money is substituted for the land, and the plaintiffs must look to the proceeds, or lose their whole claim. Mr. *Ingersoll* cited in the course of his argument the following authorities, besides those already referred to. 1 *Peters' R.* 443. *Powell,* 907-8. 144. *Chitty's Forms,* 176. *Ambl.* 652. 2 *Sch. & Lefr.* 425. 2 *Com. Dig.* 708. *Mort.* 4. a. 9. 1 *Rawle,* 270. 3 *W. C. C. R.* 276. 1 *Vern.* 455. 10 *Mod.* 488. *Ambl.* 614. 3 *Co.* 14. 1 *P. Wms.* 505. 3 *P. Wms.* 98. 402. 1 *Johns. Ch.* 425. 4 *Johns. Ch.* 334. 1 *Yeates,* 189. 10 *Serg. & Rawle,* 450.

Mr. *Chauncey* for the plaintiffs :—The special verdict presents no *actual* payment of the mortgage ; but it is contended, that there has been a *legal* exoneration of the land, effected by sheriff's sale of part of the premises before the mortgage was due, and of a small part

afterwards. The questions then are, 1st, Whether by these sales there is a legal exoneration of the land sold : 2d, Whether there is such an exoneration of the land not sold. These make it necessary to inquire, 1st, What is the legal right of a mortgagee, and what is the character of his security ? 2d. What is the effect of a sheriff's sale on that right and security ? The defendants affirm, that there has been such a legal exoneration, and argue, 1st, That a mortgage is a mere legal incumbrance on lands in *Pennsylvania* : 2d. That a sale by the sheriff is a judicial sale : 3d. That a judicial sale exonerates from all incumbrances. These propositions are all of them essential to the defence.

It is a little curious, that the profession should be engaged in settling at this time of day, the legal character of a mortgage.

The learned state the origin of this species of contract to have been with the *Jews ;* from them to have been derived to the *Greeks* and the *Romans,* and by us, to have been borrowed from the civil law. In its origin and through its progress, it has been a contract of pledge, of specific hypothecation ; and when adopted into the common law, it was used as to land, by the conveyance of the estate *on condition.* This has been the form of the contract from its origin to the present hour. It is a conveyance of the estate *on condition.* In *England,* it was at first in fee simple ; afterwards for a term of years, and latterly in fee simple again. The difference between a mortgage of lands and a pawn of goods is, that by the terms of the contract, the mortgagee has, after the condition forfeited, an absolute interest in the thing mortgaged, but the pawnee has the right only to hold the goods for his security. Hence it is said, a mortgage is a *pledge* and *more.* But in *England,* equity relieves after the condition is forfeited, and the consequence is, that this power existing in equity, the estate does not become absolute, always remains conditional, and the mortgage becomes in effect a security. This was the character of the mortgage, when it came with our ancestors to this province. It so continues to be in *England* to the present day, and has not varied here in one essential particular.

It could only be changed by the legislature, but they have been unwilling to vary its character or obligations. The act of 1705, sect. 6, 7, and 8. *Purd,* 265, was only intended to give to mortgagees a more speedy and effectual remedy : it was for the benefit of the mortgagee, and not to limit or impair his security. *Smith* v. *Shuler,* 12 *Serg. & Rawle,* 240.

Such being the history of the mortgage contract ; it never having been restricted by legislative intervention, why should it not like every other contract, be construed according to the plain intent of the parties ?

The answer is, that the law of this contract is essentially different in *Pennsylvania* from what it is in *England,* and the other states of this country ; and the points of difference are supposed to have their origin in the act of 1705. This act, however, as we have shown, was

(Presbyterian Corporation *v.* Wallace and others.)

purely remedial, and has been always so held, and the real differ-
ences have relation only to the remedy, 1st, A subsequent debt can-
not be tacked. *Dorrow* v. *Kelly*, 1 *Dall.* 142. But this even in
*England* is not by virtue of the contract: and the change with us
is only because our remedy is different, and the act of 1705, which
gives it, directs the manner in which, the surplus shall be applied.
2d. It precludes the right of dower. *Scott* v. *Croasdale*, 1 *Yeates,*
75. But this is because, by the act of 1705, the proceeds of the land
are made applicable to the payment of debts, as fully and absolutely,
when sold under a *levari* as under a different execution. This deci-
sion secures to the mortgagee the fullest benefit from the legislative
remedy: it does not affect his contract, much less impair his rights.
3d. It is said, that in *Pennsylvania* a mortgage is no more than a
security for a debt. True; and it is so in *England,* and in *New
York,* and in all the states, where the mortgage remains as original-
ly derived from the mother country. But it is every where a security
*according to the contract.* Where the contract is the same, the secu-
rity does not differ. 1 *Co. Powell.* 4. *n. B.* 1 *Coote,* 1. 3 *Johns. Ch.*
145, compared with 1 *Serg. & Rawle,* 317. 7 *Serg. & Rawle,* 411.
11 *Serg. & Rawle,* 222. 1 *Rawle,* 325. These authorities show, that
elsewhere as here, a mortgage is neither more nor less than a secu-
rity effected by a pledge of lands. In full accordance with them is
the case of *Rankin* v. *Scott,* 12 *Wheat.* 177. Again; it is contended,
that the law of *Pennsylvania,* making lands as chattels for the pay-
ment of debts, has so changed this security as that a sale discharges
from it. But it does not appear by the act either of 1700 or 1705,
that such an assimilation of lands and chattels was intended; and
even admitting the analogy, it is not true that a sale of chattels,
which have been lawfully pawned by the contract of the owner, will
free them from the pledge. These acts define the estate of the pur-
chaser to be that of the defendant. 9 *Serg. & Rawle,* 162. 11 *Serg. &
Rawle,* 138. No other acts are referred to. But on the other hand,
the whole course of legislation has recognized the character of the
mortgage contract, for which we contend. *Recording Act of* 1715,
sect. 8. *Purd.* 163. 23 *Sept.* 1783, s. 4. 28 *Mar.* 1820. 31 *Mar.* 1823,
s. 2. And when the legislature has undertaken to legislate on analo-
gous subjects, it has left this untouched as being a contract over
which it had no power. *Act* 19 *April,* 1794, s. 14, 19, 20. 18 *Feb.*
1824. 4 *April,* 1797. 4 *April,* 1798. If judgments and mortgages
were equally within the power of the legislature, why did they limit
the lien of one and not the other? But the Act of 6 *April,* 1830,
clearly shows, what has been the general understanding of the legis-
lature. There are many distinctions between the rights of judgment
and mortgage creditors. 1st. The mortgagee may recover in eject-
ment, for he has a right to the possession of the thing pledged. *Lessee
of Simpson* v. *Ammons,* 1 *Binn.* 175. *Smith* v. *Shuler,* 12 *Serg. &
Rawle,* 240. 2d. A mortgage severs a joint-tenancy, 1 *Binn.* 175, for
it is a conditional alienation. 3d. A sale by the Orphan's Court does

(Presbyterian Corporation *v.* Wallace and others.)

not affect it. *Act* 19 *April,* 1794, s. 20, 21. 4 *Dall.* 450. 17 *Serg. & Rawle,* 278. The act cleared from *debts,* not from *contracts.* 4th. The priority of right of payment of the *United States* overreaches a judgment, not a mortgage. *Thellusson* v. *Smith,* 2 *Wheat.* 396. *United States* v. *Hooe,* 3 *Cranch.* 90. 5th. The mortgage creditor is a purchaser within the statute of *Elizabeth. Lancaster* v. *Dolan,* 1 *Rawle,* 244, and the mortgage is a conditional sale. *Ib.* 248. How then can it·be contended, that a mortgage is a security only as a judgment is, and that it has become liable to all the incidents of·a merely legal incumbrance? It was not so originally: it has not been so modified by the legislature: what other power can so modify it? Who has imparted this efficacy to the arguments of counsel, or the doubts, or the *dicta* of learned judges? A mortgage is a contract whose validity and effect can only be changed by the parties to it. The legislature itself can only affect it prospectively.

It is a mistake to suppose that before the case of *Willard* v. *Norris,* the principle contended for by the defendants, was ever decided to be law, either directly or indirectly. The cases cited by Judge Tod, so far as they relate to the practice in this district, have been entirely misapprehended; and those which directly relate to the question, do not decide it, but rather avoid a decision of it. 4 *Serg. & Rawle,* 535. 14 *Serg. & Rawle,* 263. 4 *Yeates,* 308. In 3 *Yeates,* 561, *Keen* v. *Swaine,* Mr. *Sergeant,* who argued the case, informs me, that there were affidavits to show that the prior mortgagee had assented to the sale. As to the decisions, which are supposed to bear indirectly on the question, those regarding judgments, recognizances and mechanic's liens, they are all of them cases of legal incumbrances, not of contracts, and are subject of course to the same legislative will, which gives them existence. The only case regarding legacies charged on lands, until *Barnet* v. *Washebaugh,* which is only a branch from the same stock as *Willard* v. *Norris,* was *Nichols* v. *Postlestetwaite,* 2 *Dall.* 131. This, however, only decided, that where legacies were charged, the legatee had a right to claim payment from the sheriff's sale; not that if the land had sold for·half the amount charged, the purchaser would have taken clear of the charge: yet to this extent it is carried, when it is cited as deciding *Barnet* v. *Washebaugh.* Besides, a charge on lands by will, and a contract of mortgage may well be distinguished. But it may be said, that the contract must be construed with reference to the existing law. True; but we have shown what the law·was; we find no written law to change it, and as for unwritten law, the special verdict finds no custom, nor could such a custom change the general law.

The *second* position of the opposite argument is, that a sale by the sheriff is a *judicial* sale. I understand by a judicial sale, a sale by a court, of property within its jurisdiction, in its own hands. Such are sales by the Court of Chancery, by Admiralty courts under proceedings *in rem,* and by Orphan's Courts when the *res* is made subject to them: In these cases, the proceeds are *always* brought into court in

(Presbyterian Corporation *v.* Wallace and others.)

lieu of the thing sold, and *always* disposed of by the court. This it is, which is the discriminating feature of a judicial sale, from which it derives its dignity, and superior effect. The term is, I submit, misapplied, when it is used in reference to the act of a sheriff, under the instructions of an attorney, where the proceeds of sale are to be distributed by the sheriff himself, and the court takes no notice of the whole proceeding, unless specially called to do so by litigation in reference to it. After a very careful examination, I have not been able to find, that the expression was ever so applied except recently in *Pennsylvania*, and in connexion with the doctrine in question.

The *third* position is, that a judicial sale exonerates from all incumbrances. So far as this relates to incumbrances by operation of law, this may be true; but there is no warrant in any of the books for the general proposition. It is not true in the case of a proper judicial sale by the Orphan's Court. *Moliere's Lessee* v. *Noe,* 4 *Dall.* 450. No statute, no judicial *dictum* has gone to this extent. Surely it cannot release from the obligation of a contract. Can it divest a contract of lease even for a contingent term? How then can it vary the effect of a conveyance on condition, a pledge, a mortgage? How can it change the stipulated time of payment? Judgments are sometimes conventional securities, and may then stand as mortgages do; a creditor by mortgage, who has also a warrant for a judgment, may perhaps, by entering a judgment on his bond, merge his peculiar rights under the mortgage; but ordinary judgments may be paid off at any time, for the *debitum* is *in presenti,* and absolutely payable. In bankruptcy and insolvency, by positive enactment, a creditor is allowed to receive before the time; but in neither case is a pledge taken away. Mortgages are preserved, though judgments are not. *Eden,* 269.

But expediency is referred to: expediency cannot vary a contract legally entered into: but expediency invites to the opposite doctrine. The sheriff, upon whom is to be fixed the necessity of an interminable and unsatisfactory search; the mortgage creditor, who from the day of his loan, must incessantly be on the watch for sales of his premises, he knows not against whom, nor when to occur, nor how to be disguised in the description; the debtor, who is to be deprived of the means of borrowing on the best terms by a tender of the best security; all these will unite in deprecating this new expediency. The speculator at sheriff's sales is the individual, who will most approve it.

What is it proposed to hold discharged? Not the debt: that still remains. *Bank of Penn.* v. *Winger,* 1 *Rawle,* 302. We are then entitled to claim a sale under our *levari* at least of the parts which have never passed through the sheriff's hands. The debt may still be collected there. There can be no contribution claimed as against the mortgage creditor. Our incumbrance was on the record, and the premises were bought by the terre-tenants with legal notice of the fact.

(Presbyterian Corporation *v.* Wallace and others.)

Mr. *Wharton* had leave to rejoin in consequence of the course of Mr. *Chauncey's* argument.

The Act of 1715, he said, applied to *absolute deeds:* The Act of 1794 speaks of debts secured by *mortgage, judgment,* &c. in the same sentence. The Act of 1822, which gives the writ of estrepement of waste to a *mortgagee,* gives it also to the *judgment* creditor; so that no valid argument can be drawn from the act. The acts of 1820 and 1821 (*Purd.* 172, 174.) call a mortgage a *lien.* How can a mortgagee have a *lien,* and the *estate* at the same time? This would be a legal solecism. 1 *Peter's Rep.* 426. *Sup. Ct.* It was said, that a mortgagee has the estate, 1. Because he can maintain *ejectment.* If this be the reason, the action ought to be by the *heir,* not by the administrator, as it is settled it must be. But ejectment will lie in many other cases, where there is only a lien. *Gause* v. *Wiley,* 4 *Serg. & Rawle,* 528. Per YEATES, J. *Galbraith* v. *Fenton,* 3 *Serg. & Rawle,* 361. Per TILGHMAN, C. J. 2d. It is said, that a mortgage is a conveyance, because it severs a joint-tenancy. But so does an *extent* in *England. Bingham on Executions,* 104. Yet our act of assembly recognizes the discharge of an extent by a sale under a younger execution. 3d. It is said, that a mortgagee is a purchaser under the statute of *Elizabeth.* So is a judgment creditor under the act of 1798. *Bank of N. A.* v. *Fitzsimons,* 3 *Binn.* 358. But the meaning is, that he is looked upon as such for certain purposes. The case of *Wilcocks* v. *Waln* was decided on the authority of *Thellusson* v. *Smith,* which has been overruled in the case of *Conard* v. *Atlantic Ins. Co.* 1 *Peters,* 440. The position, that the purchaser is bound to look to application of the purchase money, is at variance with principle and the authorities. *Scott* v. *Greenough,* 7 *Serg. & Rawle,* 199. *Negley* v. *Stewart,* 10 *Serg. & Rawle,* 207. *Bank of Penn.* v. *Winger,* 1 *Rawle,* 302. *Wortman* v. *Conyngham,* 1 *Peters' C. C. Rep.* 241, 244. *Stahle* v. *Spohn,* 8 *Serg. & Rawle,* 327. The argument *ab inconevnienti* presses more strongly on the side of the terre-tenants. Our system provides ample notice to the mortgagee. Notice is given, 1st, Of the levy, if the execution be upon a judgment: 2. Of the sale by handbills on the property, and advertisements. 3d. The sale is in the most public place in the city or county. 4th. If the money be brought into court, the auditor gives notice by public advertisement. What more could a court of chancery do? The sheriff gives ample security for any mis-appropriation of the fund. The proceeding is *in rem,* and the mortgagee is bound to look to it. The rule is not universally true, that a prior mortgagee is not bound to take notice of subsequent events. Suppose a street or road should be opened through the property and take away, as is sometimes the case, the principal part of it. His lien would be transferred to the damages given by the jury, which he would be bound to look after. Suppose the land should be submerged, as in the case of *The Schuylkill Nav. Co.* v. *Thoburn,* (7 *Serg. & Rawle,* 411.) Suppose the buildings

(Presbyterian Corporation *v.* Wallace and others.)

should be destroyed by fire, and that they were insured. Public convenience requires that on a judicial sale, prior liens should be divested, and land turned into money, to be applied to those liens, and however particular cases of hardship may be regretted, yet the paramount consideration must prevail. It is believed, however, that with moderate attention on the part of the mortgagee to the situation of the property, there is no risk of loss.

The opinions of the court were delivered by

Gibson, C. J.—No prudent judge will disregard an opinion of the bar. During an experience of fifteen years in this court, I have seldom found one of its decisions received with disapprobation at the bar, which did not contain something which called for revision. But professional opinion, though valuable as a test of judicial decision, is not infallible. The principle recognized in *Willard* v. *Norris,* was viewed in a particular part of the state, as a portentous novelty; yet a little consideration would have shown it to be a familiar part of the jurisprudence of every civilized people, whether ancient or modern. Of this, as regards the civil law, which with local modifications, is the code of continental Europe, there is not a doubt. "The principal effect," says *Ferriere,* "of an adjudication by decree, (judicial sale) is a transfer of all the rights of property to the highest bidder, so that he cannot be disturbed by lien creditors, or mortgagees, who have not made resistance to the decree; nor after sale and confirmation, by any claimant of title to any part of the estate levied, because the decree extinguishes (*purge*) all rights of property, mortgages, incumbrances, and quit rents, (*charges reelles et foncieres*) in default of opposition (*Dict. de droit, verbo, Saisie reelle.*") " In the language of the law," says *Denisart,* who repeats the same principle, " the word *opposition* signifies an act by which the execution of a judgment by default is resisted, having for its object the prevention of a sale, till the interests of the opposing party are secured." (*Collect. de jurisp. verbo, opposition.*) The resistance being in substance the defence of a terre-tenant to a scire facias, is to be of course before the decree of confirmation. The sale is strictly judicial, being pursuant to an adjudication, and the proceeds distributed by the court among the creditors according to the priority of their liens or classes. (*Dict. de droit, verbo, ordre.*) Thus we have distinctly announced to us a principle of the civil law, by which not only are liens extinguished, but even an estate paramount to the lien of the seizing creditor is divested. Such also is the rule of the maritime law, which distributes among lien creditors the proceeds of a ship sold by order of the Court of Admiralty on a younger lien; an instance of which is found in the case of the *Madonna,* (6 *Robinson,* 207.) I certainly do not pretend that the practice of the civil law is to have the force of precedent in the courts here; but, in a case like the present, it seems fair to say, that it goes far to efface the impression of juridical novelty. At the common law there is no judicial sale of lands, and of course we have

no *English* authorities directly in point.   In chancery the practice is to pay off incumbrances out of the purchase money, which appear on the master's report, and no other is paid, only because, as it is said, there is nothing to show the court that there is such an incumbrance.   (*Vide* —— *Stretton,* 1 *Ves. Jr.* 266.)   But this exception helps to establish the rule, and demonstrates not only the ability of the court to extinguish incumbrances, but its readiness to do so when judicially informed of their existence.   When, however, an incumbrance cannot, for any cause whatever, be satisfied out of the purchase money, it of course remains there, as it does here, a charge on the land.   But in chancery the process of sale is such, as to admit of exceptions that have no place in a sale on execution which requires prompt payment by the purchaser, and deprives him of an opportunity to see to the application of the purchase money, *by reason of which the rule is applicable in all its force, to judicial sales of chattels at the common law.*   As to these, liens created by the act of the parties, require transmutation of the possession, and as goods taken in execution must be actually seized, the reversionary interest of the owner, so to speak, cannot be levied, and for this reason perhaps it is, that goods pawned cannot be taken in execution before they are redeemed.   But conflicting liens are created by delivering conflicting executions to the sheriff; and it is perfectly settled that a sale on a younger execution divests the lien of the older one, which takes, not the goods in the hands of the purchaser, but their price in the hands of the sheriff.   Would it not then have been strange, if our progenitors had not applied the rule of the common law to land, when they subjected it to sale on a common law execution *as a chattel.*   They carried the consequences of the principle further than is demanded here, and held that a judicial sale divests, without compensation out of the purchase money, the wife's incohate *estate* of dower—an interest in the land certainly as sacred as that of a mortgagee.   At the end of a century, in which the most curious legal antiquarian might be challenged to produce an instance of a sale on an older judgment, after there had been a sale on a younger one, the practice of satisfying the older judgments out of the purchase money, received the sanction of a direct judicial recognition by the court; and as far as I have ever heard, with the most perfect acquiescence, of the legislature, the bar, and the people.   The rule, therefore, having been incontestibly established, as regards incumbrances generally, it will require decisive arguments to prove a mortgage to be an exception.

This has been attempted on two grounds; the first, that the mortgagee is not an incumbrancer, but *the owner of an estate in the land,* has been abandoned by one of the eminent counsel, who have argued for the plaintiff.   He has thought proper to occupy the second ground, that the lien of a mortgage is *created expressly by the act of the parties,* while the lien of a judgment is but incidental. Of these in their order.

In form, a mortgage is certainly a conveyance; but it is unques.

tionably treated at law here, in the way it is treated in equity else-where, as a bare incumbrance, and the accessory of a debt. As between the *parties* it is a conveyance, *so far as is necessary to enforce it as a security :* As regards *third persons*, the mortgagor is the owner, even of the legal estate. This distinction, which, if attended to, will be found to reconcile the apparently jarring *dicta* of the judges, is as firmly established by the practice and decisions of the courts in Pennsylvania, as any other in the law. If the mortgagee had the title for any other purpose than to afford him a remedy, it would not be easy to account for the absence of all the incidents of his supposed ownership : yet his estate, if such it be, certainly cannot be set up as outstanding to bar an ejectment by the mortgagor, or an action of trespass, or a proceeding to obtain compensation for a privilege under a statutory license ; nor is it subject to taxation, or lien by judgment, or sale on execution, or survivorship by reason of joint tenure, or courtesy, or dower. It does not break the descent of the estate, or require a reconveyance to revest the title, or prevent it from vesting in a purchaser, or affect the validity of a second mortgage. In answer to the last remark it has been said, that a second mortgage is always of the equity of redemption, which I admit may be the subject of hypothecation. But what will be said of a third mortgage after the equity of redemption also has been conveyed? Contrary to the professional sentiment here, it would be simply void, unless there be equity of redemption springing from equity of redemption in an infinite series, like certain mathematical quantities, which, though perpetually vanishing, are perpetually in view. Such a mortgage would be incapable of confirmation, even by payment of the preceding ones, unless the vesting of the estate in the last mortgagee were supposed to have awaited that event : a process not at all in unison with our notions of conveyancing. But this qualification of the mortgagee's legal estate, seems to be recognised in some degree, even in *England.* " A mortgagor in possession," says Mr. *Powel*, " gains a settlement, because the mortgagee, notwithstanding the form, has but a *chattel*, the mortgage being only a pledge to him for security of his money ; and the original ownership of the land still residing in the mortgagor, subject only to the legal title of the mortgagee, *so far as such title is requisite to the end of his security." Law of Mortgages*, 221. That the legal effect of the instrument should have been modified by time and circumstances, will not appear *incredible to those* who are familiar with the change produced by usage in the legal effect of a policy of insurance, which has been fixed, not by the letter, but the course of trade, which, with frequent discussion, repeated decisions, and length of time, has reduced the meaning of a very incoherent instrument, to a reasonable degree of certainty. *Marsh. on Ins.* 304. Again, by the stat. 7 and 8 *W.* 3. c. 25, a mortgagor in possession is treated as a freeholder so far as to entitle him to vote for members of parliament. This, being a matter of arbitrary enactment, may be said to prove nothing : it discloses, however, the dawn of a sentiment which has

(Presbyterian Corporation *v.* Wallace and others.)

been carried much further by the courts. In *Martin ex dimiss. Weston* v. *Mowlin,* 2 *Burr.* 978, it was determined in the King's Bench, that the interest of the mortgagee does not pass by a devise of *land,* Lord MANSFIELD, who delivered the opinion of the court, declaring, that a mortgage is a mere charge ; and that the estate of the mortgagee being the same thing as the money due on it, will pass as an accessory of the debt, *by a will not executed according to the statute of frauds,* or become extinct by parol: and the same judge afterwards pronounced it an affront to common sense to call the mortgagee the owner. Down to the case of *Williams* v. *Bosanquet,* 1 *Brod. & Bingh.* ☞, which is not authority here, thus stood the law in *England ;* and in the state of *New York,* where the distinction between equity and law is as scrupulously observed as in any part of the world, it has been explicitly declared in *Hitchcock* v. *Harrington,* 6 *Johns.* 290, to be the settled doctrine of their courts of law, that the mortgagor is seized as to all persons but the mortgagee ; and the principle thus broadly announced, has been carried out in many subsequent cases. " Not only the original severity of the common law," says the distinguished commentator on *American Law,* " treating the mortgagor's interest as resting on the exact performance of a condition, and holding the forfeiture or breach of the condition to be absolute by non-payment or tender at the day, is entirely relaxed ; but the narrow and precarious character of the mortgagor at law is changed under the more enlarged jurisdiction of the courts of equity. *Their influence has reached the courts of law,* and the case of mortgages is one of the most splendid instances in the history of our jurisprudence, of the triumph of equitable principles over technical rules, and of the homage which those principles have received in *their adoption in the courts of law.*" 4 *Kent,* 151-2. If such, then, be the progress of equitable principles, in courts purely of common law jurisdiction, what might we not expect it to be in courts which are a forum for the joint administration of law and equity ? The principle that the mortgagor is seized as to every one but the mortgagee, was asserted by this court in the *Schuylkill Nav. Company* v. *Thoburn,* 7 *Serg. & Rawle,* 411 ; and in *Rickert* v. *Madeira,* 1 *Rawle,* 325, it was applied to the interest of a mortgagee, which was held to be exempt from execution because he had not an estate in the land. In *Scott* v. *Croasdale,* 1 *Yeates,* 75, it was determined that dower is barred by a sale on a mortgage executed by the husband without the concurrence of his wife ; from which it is clear, that the mortgage was not viewed as the conveyance of an estate, (for the estate of the wife passes only by the joint act of herself and her husband) but as a legal incumbrance, like a judgment on which dower may be divested on the principle that the land is sold as a chattel. These cases, with *Wentz* v. *Dehaven,* 1 *Serg. & Rawle,* 319, and *M'Call* v. *Lenox,* 9 *Serg. & Rawle,* 302, in which a mortgage was in all essential respects put on a footing with a judgment, very satisfactorily disclose the judicial sentiment of *Pennsylvania;* to which

(Presbyterian Corporation *v.* Wallace and others.)

may be added *Blanchard* v. *Colburn*, 16 *Mass.* 346, as showing a similar sentiment in *Massachusetts.* It is supposed, however, that *Simpson's Lessee* v. *Ammons*, 1 *Binn.* 175, in which it was held on the authority of *York* v. *Stone*, 1 *Salk.* 158, that a mortgage by a joint tenant is an act of severance, looks the other way, inasmuch as it is thought to be incapable of producing that effect without operating as a conveyance. We know how eagerly a pretext is sought to elude the odious incident of survivorship; as for instance the execution of an *elegit* on the joint estate of one of the tenants, which is held to work a severance, *Gilb. on Executions*, 41. Yet tenant by elegit has but a chattel. 2 *Inst.* 396. An inference has been attempted also from *Lancaster* v. *Dolan*, 1 *Rawle*, 231, which, it seems to me, it does not warrant. It was held there that a mortgagee is a purchaser within the 27 *Eliz.* and entitled to all the advantage which the character can give him in a conflict with a volunteer. But that proves nothing which has not already been conceded. The title doubtless passed as far as was necessary to the protection of his security, and so far the mortgagee was a purchaser in the strictest sense of the word. At one time it was doubted whether a judgment creditor is not a purchaser within the true intent of our recording acts, and it has been barely held that he is not; yet no one ever suspected him of being the owner of an estate in the land. As to the other ground of the inference from the position there taken, that a mortgage is a conditional sale, every one the least conversant with the doctrine of powers, knows that in the execution of them, form is substance; and that a mortgage, being in form a conditional sale, may be a valid execution of a power to sell without conveying the estate, to every intent. The case of *Ripple* v. *Ripple*, 1 *Rawle*, 386, has also been cited; but it seems scarcely necessary to say, that the nature of the incumbrance there, was such as to preclude it *from being* deducted from the purchase money. Finally, it has been determined, that the mortgagee may maintain ejectment against the mortgagor; but that is entirely consistent with the principle conceded at the outset, that the mortgagee is the owner, so far as is necessary to enable him to enforce his security. In fact, the only case in which a contrary sentiment has been intimated, is that of *Moliere's Lessee* v. *Noe*, 4 *Dall.* 450, but there the opinion on the particular point to which I allude, was not only an *obiter* one, (for the point did not arise) but that of a bare majority; and it was beside formed at a time when the professional sentiment was in a state of transition. Although now too late to question it in a case like the one supposed, it is hazarding little to say, that if an expression of judicial opinion on it had been delayed a few years, the result would have been different. Besides, the opinion of the chief justice was founded in some degree on a distinct provision of the same act.

So much for judicial decision, by which a mortgage has with a single exception been treated as an incumbrance; and the legislature seems to have acted on the same principle as a fundamental

(Presbyterian Corporation *v.* Wallace and others.)

one.  In the act of 1705, by which the mortgaged premises are subjected to execution, the mortgagee was treated as an incumbrancer, and not as the owner, even at that early day.  As an accessory of the former ownership, the equity of redemption, although originally a creature of chancery, was considered to be inherent in the land, even without the existence of a court of equity to protect it; and the estate of the mortgagee, which would, by the terms of the grant, have become absolute by a breach of the condition, continued to be viewed as a contingent one.  In truth, the inconvenience of treating the estate as it had stood at law, without a court to give relief on equitable terms, would have been intolerable.  Accordingly, the remedy provided was not to enable the mortgagee to foreclose, but to get his money out of the land by a sale or extent, " as in case of *other* lands sold or delivered *on executions for debts or damages.*"  He was thus put exactly on a footing with a judgment creditor ; and it is worthy of notice, that the legislature even then, recognised as applicable to a sale on a mortgage, the principle of judicial sales, subsequently applied in practice to all other cases, by directing that the purchaser hold clear, not only of the equity of redemption, but of all incumbrances whatever; thus disposing of the whole estate at once, instead of the particular interest of the execution creditor.  In the act relative to mortgages, passed in 1820, the instrument is treated purely as an incumbrance, its lien being declared to attach, not at the execution of the deed, as it would necessarily have been supposed to do, had it been considered as arising from the vesting of the estate, but from the period of its being entered of record.  So, in the acts of 1822 and 1823, the mortgagee is spoken of merely as the holder of a security, and one that may be released in part, or gradually discharged by indorsement of payment, as the instalments become due.  These are the earlier and principal acts that seem to bear upon the question.  But it is supposed that a different notion is perceptible in the act of 18th of *February*, 1824, by which guardians and other trustees are authorized to invest the moneys of the trust " in real securities," at such rate of interest as the Orphan's Court may direct; and hence it is supposed that the securities thus spoken of are mortgages; that the legislature deemed it necessary to the purposes of the trust, that the investment should be permanent; and that to protect it from interference by the other creditors, it must have been considered that the mortgagee had an estate in the land.  It seems to me this train of suppositions is entirely gratuitous.  If the legislature had intended to designate a mortgage, they would have done so specifically instead of using a generic term.  Beside, there is no reason to impute an intention to restrain the investment to this species of security, when a bond and warrant, or a redeemable ground rent, or a conveyance in trust with power to sell, would all equally answer the description, and two of them the object supposed to be intended.  It cannot be doubted then, that the legislature had no view to the point mooted here.  At its last session, however, it must be conceded that the legislature

(Presbyterian Corporation *v.* Wallace and others.)

viewed the matter in a light entirely different, and it has been suggested that a due deference to its opinion requires us to retrace our steps.   The act which changed the law laid down in *Willard* v. *Norris,* was a constitutional exercise of legislative power; and regarding it as furnishing a rule for cases in time to come, it will be executed by this court, in good faith, even to the letter.   But we will never consent to attribute judicial authority to a branch of the government, whose province it is to enact the law, and not to administer it; nor surrender the constitutional franchise of the judiciary, by bowing to every intimation of a judicial opinion that may be supposed to proceed from the legislative halls.   I, therefore, do not acknowledge the legitimacy of the argument drawn from a supposed intimation of legislative interpretion, that the opinion held by this court in *Willard* v. *Norris,* was an erroneous one.   I admit that a *prospective* intimation by a course of legislation on the basis of a state of things supposed to exist, is a strong evidence that it does exist, inasmuch as it gives rise to rights founded partly in enactment and partly in usage; but here the existence of the law as settled in *Willard* v. *Norris,* was taken for granted as the foundation of the act which changed it, and which was a legislative affirmation of the very fact which it is the purpose of the argument to disprove.   All other legislative acts, however, are in unison with the judicial sentiment, that a mortgage is purely an incumbrance.

But taking it to be an incumbrance, it is said to differ from a judgment in this, that it is created directly and expressly by the contract, while the lien of the judgment is the effect of the law; and this is the second principal ground of the argument.   Admitting for the present this difference to exist, it is not easy to see what objection it furnishes to the application of the general principle.   It is said that to discharge the incumbrance against the mortgagee's consent, would impair the obligation of the contract.   It is obvious that the argument would not touch the case of a mortgage which is due, inasmuch as payment by the mortgagor or any one in his place as a purchaser of the equity of redemption, would stand with the very letter of the contract.   But how would it affect the contract to compel the mortgagee to receive satisfaction even before the day of payment?   Even as respects the acts of the legislature, the constitutional inhibition relates only to contracts which exist at the enactment of the law.   I believe no one ever doubted the power of the legislature to regulate the obligation of contracts prospectively, or to take it away altogether, as was done some years since, in regard to the contracts of certain unchartered banks.   The parties contract subject to the provisions of the law which enter into their stipulations, and thus tacitly become a part of their agreement: and when the law requires that a mortgage be subject to payment, in certain circumstances, before the day, it is as much an original condition of the contract as if it had been expressed in terms.   But a decision of the judiciary is so far different from an act of the legislature, that it declares no new law;

and consequently can never operate as an *ex post facto.* It merely recognises a rule so long respected in practice as to authorize a presumption of its having been adopted originally by common consent, and in that aspect it is treated as having been the law from the beginning. Such was the origin and growth of the custom which gives the tenant the way-going crop, and impairs the obligation of the contract resulting from its apparent terms, so far as to give the tenant an interest beyond the expiration of his lease. No well advised judge will claim a right of legislation. Independent of the fact that all legislative power is placed by the constitution elsewhere, (a consideration that ought of itself to be decisive) every usurpation of such a right hitherto has proved to be extremely pernicious in its tendency to impair the public confidence in the stability of judicial decision, and subject the rights of the suitors to the prejudices and caprice of the judges. I take it then, that a judicial decision is not to be taken for an act of legislation; and that if the policy of the law, about which I shall have occasion to speak more particularly, should require the contract of hypothecation to be laid under restriction so far as to expose it to the casualties, that are incident to every other species of incumbrance, the constitution interposes no bar. But is the proposition that the lien is a matter of formal and express stipulation founded in fact? By the terms of the contract, the mortgagee is to have not a lien, but an estate; and that he *has* a lien and not an estate, is as much the *legal effect* of the instrument as lien is the legal effect of a judgment. It must be admitted, however, to be the intent of the parties that the contract shall create a lien, because they know that such will be its legal consequence, and they may therefore be said to stipulate with a view to it. But precisely such is the intent of parties who resort not to a mortgage, but to a judgment with stay of execution. In both cases the object is real security, not by stipulating for it in terms as in the case of recognisance; but by performing an act of which it is in the one case and in the other a legal consequence: the difference being that the judgment pledges all the debtor's land, within the county, and the mortgage only the lands described in the deed. For this reason a bond and warrant are thought to be the better security; insomuch that no creditor in the country accepts a mortgage except the vendor of the land, who is generally content to rely on the security of the estate with which he has parted.

It seems to me, that the preceding remarks dispose of the principal grounds of the argument; but we have ample evidence that no distinction between mortgages and judgments was ever made in practice. The doubt in the case of an older judgment was, whether any thing but the clear resulting interest of the debtor could be sold; and on the theory of those by whom it was entertained, it is singular that it should have arisen. It was a postulate of that theory, that the interest of the older judgment creditor *did not pass by the sheriff's deed,* and in that view it is clear that he would not be entitled to satisfaction, out of what was paid, not as the price of his interest, but

of that which had become the fund of the younger judgment creditor by virtue of his lien. To suppose that he might resort to the purchase money or the land at his pleasure, was an evident inconsistency; and an admission of his right to take the purchase money, which seems never to have been doubted, ought at once to have settled the question. The purchase money could be substituted for the land, and distributed among the lien creditors only on the supposition that the sale had divested their right to every thing else. At present, however, our business is with the evidence which we have, of the earlier practice; and this appears by the manuscript of Mr. Justice SHIPPEN, to have been fully developed in *Febiger's* lessee v. *Craighead,* which was tried at *Carlisle* in 1793. *David Hoge,* who had been the sheriff of *Cumberland* county from 1769 to 1772, testified " that the usage had been *for thirty years,* that when the sheriff knew of a mortgage, he sold subject to it ; but that where he had no such knowledge, and the mortgage was not recorded, he sold *absolutely,* and paid off judgments *and mortgages* according to their priority : That it was considered that when the land was sold absolutely, it discharged *all* former incumbrances as to the purchaser, and that the sheriff looked to the payment of judgments according to their order." *Samuel Postlethwaite,* who had been the sheriff of the same county, from 1783 to 1786, testified " that he *had* sold land subject to a mortgage, in which case the mortgage money was to be paid first." This short note of his evidence is evidently imperfect, the meaning being that the mortgage was to be paid first, when a clear title was sold ; and in this aspect his evidence is consistent with that of sheriff *Hoge.* Now it is in vain to question the sheriff's right to prescribe the conditions of the sale : if a practice which, according to the account of it there given, has prevailed for seventy years, may not confer it, we have no foundation for many of our most important laws of domestic origin. Mr. *Hoge's* representation of the practice was at the same time corroborated by the testimony of Colonel *Hartley,* Mr. *Bowie,* and Mr. *Charles Smith,* all professional gentlemen of great experience in one or more of the counties of *Lancaster, Berks, Cumberland, York, Franklin, Bedford, Mifflin, Huntingdon* and *Northumberland,* which then comprised that part of the state which is east of the *Alleghany* mountains, and west of a line midway between the *Susquehanna* and *Delaware.* In addition, when the cause came up in bank, the practice was asserted by Mr. *Lewis* to be general, and this without contradiction from Mr. *Ingersoll,* retained on the other side, or from the judges, who undoubtedly had ample opportunity to become acquainted with it on their circuits, in every part of the state. No man was better acquainted with the earlier practice and traditions of the law, than Mr. Justice YEATES ; and it is easy to discover from *Keene* v. *Swaine,* 3 *Yeates,* 561, what he supposed it to have been in the matter before us. In the counties west of the *Allegheny* mountains, I am informed by my brother KENNEDY, whose experience there reaches thirty years back, that a different impression had been

made on the professional mind by the late president ADDISON, whose opinions were held in deserved respect; yet no one in that part of the state supposed there was a difference between mortgages and judgments, the supposition being that the sheriff could not in *any* case sell more than the resulting interest of the debtor. This impression was, however, gradually effaced by the influence of the judges of this court, on the western circuit, and the matter came to be viewed there as it was elsewhere. That it was the practice in the eastern counties to sell clear of mortgages, appears satisfactorily from *Petry* v. *Beauvarlet,* 1 *Binney,* 97, in which the sheriff of *Bucks* was allowed poundage for paying judgments and *mortgages.* To say that the point was not presented to the court, the matter having passed *sub silentio,* is to say nothing. What we want is the fact that an instance of the practice passed in this city, unchallenged by the debtor, or the younger lien creditors, who are usually as sharp sighted and true to their interests, as any other parties litigant in our courts. Certainly it would not have passed as a thing of course, had it been considered as great a phenomenon then, as it has been since; nor will it do to say, the payment may have been with the assent of the mortgagee; he had no right to assent to an arrangement that would enable him to pocket the money of the younger lien creditors. A pretence of right on his part to take satisfaction out of the land or purchase money at his pleasure, and thus throw the burthen on the purchaser, or younger lien creditors, as his interest or caprice may dictate, would be monstrous; such a right would put him in a situation to make terms that would give him more than his debt. How this pretence, which involves the same inconsistency of opinion that I have already noticed in the case of a prior judgment, came to receive countenance, I know not. The difficulty might have been solved by a simple inquiry into the extent of the interest which passed by the sheriff's deed. The drift of the argument here, has been to prove that a sale on a younger judgment passes, not the estate of the older mortgagee, for that is supposed to be reserved, *but the equity of redemption;* in other words, the clear interest of the mortgagor which the judgment bound, *and which the mortgage did not bind.* It is not easy to see then, how the mortgagee could make pretence of right to what did not pass by his deed; and which being the subject of subsequent hypothecation by the debtor, constituted no part of his security. How the interest bound by the mortgage can remain in the land, and at the same time be in the money which has been paid for it, so as to enable the mortgagee to take satisfaction out of the one or the other at his option, is what I am unable to comprehend, and the counsel have not attempted to explain. To give him the benefit of that, would enlarge his security to twice its original extent, and be a gratuity at the expense of the mortgagor and the younger lien creditors. As well might the general creditors of a partnership demand the proceeds of a separate execution of the interest of one of the partners which consists of what may remain after payment of the

joint debts. But however inconsistent with the scope of the argument such a right of election would be, it is not more so than the modern practice which is said to prevail here. According to this, the sheriff sells, neither subject to, nor altogether free from, prior mortgages, but subject, where less than the amount of the mortgage is bid, to affirmance or disaffirmance of the sale by the mortgagee; according to which the premises are returned sold or unsold, for want of bidders. The uncertainty of result consequent on this, must necessarily have an unfavourable influence in preventing the attendance of purchasers; but the practice admits the very reverse of the plaintiff's argument. It admits, that when a sale is effected, *the whole estate,* and not the equity of redemption merely, is sold, and that the mortgagee is bound to take satisfaction out of the purchase money. It may be reasonable that a younger lien creditor should not be at liberty to disturb an older incumbrance, where there is no surplus to be got at; and at one time an idea prevailed in the country, on what authority I know not, that the sale might be set aside, if no part of the proceeds were found to reach the execution of the seizing creditor. We give no opinion about that, but it is evident that the same idea has given rise to the practice here, else the mortgagee would be consulted in all cases, whether the proceeds were more than adequate to satisfy his debt or not. But if the land were sold subject to his mortgage, the matter would not depend on his volition, more than it would on that of a stranger; he would be bound to look to the land exclusively, and not take satisfaction in a way to disappoint those who have no fund, but the equity of redemption; and that he may look to the price, proves that his estate has been sold, for undoubtedly he can be compensated for nothing else out of the purchase money. A practice then, which has prevailed in every part of the state for more than seventy years, probably from the foundation of the province, ought, one would think, to be received as conclusive evidence of the law. It is said that practice, to be available, ought to be preceded by judicial decision. It seems to me, however, that this would be an inversion of the usual process of formation; judicial decision not being in any case a nucleus for the increment of the law, but, as in the case of the tenant's right to the way-going crop, the recognition of it as a thing already established by the custom of the country.

The argument *ab inconvenienti,* did the matter rest in discretion, would be inconceivably strong. I have heard with surprise an expression of regret, that the law had not been so settled originally, as to subject the land in the hands of the purchaser, even to prior judgments. This must surely have been said without consideration. If each lien creditor were separately permitted to carve for himself, by selling just what might be sufficient to get his money out of the land, a great part of the estate would go among the retainers of the law. Full costs and poundage on every sale, would be just so much taken out of the pockets of the younger lien creditors, who would have come in for a share, had the land been turned into money, by one ope-

ration for the benefit of all. Beside, no one would be found willing to purchase except at a prodigious undervalue, with the certainty of being annoyed by a series of executions to enforce the prior liens; and thus the younger lien creditors would be kept at bay: and the same consequence, or one as bad, would result from the sale on the oldest lien. The principle insisted on, is, that a creditor can sell no more than he holds by his lien : on no other hypothesis than that all beyond what is necessary to satisfaction belongs to the debtor, could there be a resulting interest in him to answer subsequent incumbrances. What right then would an older incumbrancer have which a younger one has not, to divest the security of any one else farther than may be necessary to produce satisfaction of his debt ? The abstract principle fairly carried out would require him to sell an undivided interest to the value of his incumbrance, and to strike it down as soon as enough were obtained to satisfy the debt and costs. This preposterous but necessary consequence of the principle, has been put out of view by the legislature, who foreseeing the inconvenience and confusion that would ensue from selling the estate piecemeal, have invested the purchaser with title to it, as it was held by the debtor. But a most oppressive consequence of the doubt generated by the principle of the argument, and communicated to the public mind by the imperfect report of *Febiger's Lessee* v. *Craighead,* in the 4th volume of Mr. *Dallas' Reports,* has been a sacrifice of property to an incredible amount. It is not too much to compute this at ten per cent. on every judicial sale of land that has since been made. Instances are within my knowledge of thirty per cent. on the purchase having been offered in confidence of the purchaser's skill, by those who, at the sale, refused to hazard a dollar on their own. Is it not equally the interest of lien creditors, whether by mortgage or judgment, as well as of the debtor himself, and indeed of all but those who speculate in bargains, that the land should go for its value ? The public interest at stake is immense; and even if a temporary hardship from the principle of *Willard* v. *Norris,* were experienced in a particular quarter, it would be greatly more than counterbalanced by the permanent benefit that would result to the community at large. Public convenience, however, is supposed to require that this species of property be set apart and consecrated to investment by those who may be prevented by absence or other causes from attending to their property. If this consideration were imperative, its requirements might be satisfied by the public stocks, which afford all proper facilities; but even if they did not, there is no species of investment that ought to be so sacred as to control the maxim that the public good is the supreme law. But the inconvenience that would have resulted to mortgage creditors from the decision in *Willard* v. *Norris,* would have been neither permanent nor great. They would have ceased to invest in lands at a distance; and as to defrauding them by a sham sale at an undervalue, that would have become impracticable the moment it was ascertained that the purchaser was to

(Presbyterian Corporation *v.* Wallace and others.)

have an unincumbered title.   But they would have suffered no more in this respect, or by reason of the apprehended insecurity of the purchase money in the sheriff's hands, than judgment creditors do at present ; and I have heard no complaints by these, of losses from collusive or surreptitious sales by younger judgment creditors.   Even if there were just ground of apprehension on this score, further precaution might be taken by the courts.   Mortgage creditors have certainly not been treated as having peculiar claims to protection in other matters ; as in cases of injury to the premises, under the road law, for which the mortgagor receives compensation, without notice to the mortgagee ; and I am unable to see why his interest should be preferred to that of every one else in the matter of a judicial sale.

It will be seen that the preceding remarks are intended for a mortgage not due.   As between the mortgagee and purchaser, who, as owner of the equity of redemption, stands in the place of the mortgagor, it is impossible to conceive of an objection to a payment which consists with the letter of the contract ; and whatever might be the right of the mortgagor or the intermediate lien creditors to demur to performance of the condition out of the money in the sheriff's hands, it is certain the mortgagee himself could not: but standing in every respect as a judgment creditor, he cannot object to payment even before his debt is due ; as has already been determined in the *Commonwealth* v. *Alexander*, 14 *Serg. & Rawle*, 257, and intimated in *Barnet* v. *Washebaugh*, 16 *Serg. & Rawle*, 410. And this disposes of the general question which a respect for the opinion of counsel who have doubted the soundness of the principle of *Willard* v. *Norris*, has induced us to have re-argued on its original ground.   It is unnecessary to say that the result is a firm conviction of its solidity.   It remains to inquire how far it affects the plaintiff's lien on the whole, or any part, of the mortgaged premises.   As to this, my opinion happens not to coincide with that of the majority ; and the judgment of the court on the part of the case will be pronounced by my brother Huston.   The reasons that weigh with me are these :—

The lot held by *Jacob R. Smith*, and the two lots held by *James Hunter*, have been sold, and they are consequently exonerated.   According to the principle of the *Bank of Penn.* v. *Winger*, 1 *Rawle*, 295, the lien is gone, although as regards whatever went in payment of the mortgagor's creditors, the debt remains a personal charge. The question, then, is, how far the residue of the mortgage debt, deducting what the plaintiff could have received out of the proceeds of those executions, affects the residue of the mortgaged premises.   The lot held by the heirs of *Charles Stewart*, on *High* street, has not been sold on execution, and the question of its liability depends on principles of contribution among the remaining *terre-tenants*, by which it is well settled, a court of equity will direct the mortgagee to levy his debt in a way to do justice to all, as far as it can be done without prejudice to his security.   The facts are, that in 1810, the mortgagor conveyed the whole mortgaged premises to *Gideon Cox*, who,

(Presbyterian Corporation *v.* Wallace and others.)

having conveyed the lots on *High* street held by *Smith, Hunter,* and *Stewart's* heirs, to persons from whom they derive title, reconveyed the residue in 1816, to the mortgagor. In this residue, then, the mortgagor became seised of his old estate, as if it had not been out of him ; and how does the question of contribution stand between him and Mr. *Cox,* or those who have acquired his equities ?

Every loan, though secured by mortgage, creates a personal debt from the borrower, whether there be a bond or covenant for payment or not ; and as between the mortgagor and his alienee, the mortgage is but a personal debt, the mortgagor being the principal, and the land only a security. It is otherwise, however, between an alienee and an alienor, who has taken the land by descent or purchase, subject to the charge ; in that case the land is the principal debtor. The authorities for this are collected in the notes to *Howel* v. *Price,* 1 *P. Wms.* 294, and *Evelyn* v. *Evelyn,* 2 *P. Wms.* 664. It would be strange, therefore, if the mortgagor who stands as principal, could demand contribution of his surety for his proper debt. It was satisfactorily shown in *Nailer* v. *Stanley,* 10 *Serg. & Rawle,* 450, that he cannot. I shall not stop to inquire whether that case has the support of any *English* authority. It rests on the authority of decisions more signally entitled to respect than those of any Chancellor since the *American* Revolution, with the exception perhaps of Lord *Eldon ;* and on the plainest principles of natural equity : I allude to *Clowes* v. *Dickenson,* 5 *Johns. Ch.* 235, and *Gill* v. *Lyon,* 1 *Johns. Ch.* 447. But I take it, a decision of this court, which, as in *Nailer* v. *Stanley,* innovates on no plain and settled principle of law, does not require the aid of foreign authority. It is supposed, however, that priority of equity from priority of conveyance, is abolished by the act which prevents a release of part of the mortgaged premises from operating as a release of the whole, further than as regards the proportion of the general charge which the part released was bound to bear. They certainly have not in terms declared what shall be the relative liability of the separate parts ; but it is supposed that as they legislated for a particular case, they intended that there should be no other. This assumption appears to me to be evidently gratuitous. The case of most frequent occurrence, is precisely the one that was in the eye of the legislature. It arises wherever the mortgaged premises have been conveyed at the same time, but in separate portions, by the mortgagor, or by his heir or alienee of the whole, at different times ; as will be seen by an examination of the authorities to which I have already referred ; and it is, therefore, sufficiently common to satisfy the whole operation of the law, without imputing to the legislature a design not expressed, to cut through all opposing equities, for the purpose of reducing all the parties to a level. The fact is, the legislature interposed no further than was necessary to guard against the apprehended consequences of releasing a part of the land from the burthen of the mortgage, which in the case of a quit-rent, certainly releases the whole. On the principle of *Nailer* v. *Stanley,* then, the

plaintiff can have recourse to the lot of *Stewart*'s heirs, only in the event of the reconveyed portion of the premises being found inadequate to the purposes of satisfaction.

That portion, together with half as much more of the mortgagor's other ground fronting *Thirteenth* street, was cut up into lots, and separately conveyed at a susbequent day. Of these, the one now held by the heirs of *Stewart*, (on *Thirteenth* street,) and the one held by *Dolly* and *Susan Davis*, have since been sold on execution, and they also are exonerated. There remains then to be considered the liability of the two lots held by *George Pepper*, these having been bought in by him on his own execution for less than the debt. Had he received the proceeds of a sale to a stranger instead of the ground itself, he would have been in the situation of a creditor, who, though paid out of his order, may retain against the party originally entitled, on the principle of *Carson* v. *M'Farland*, 2 *Rawle*, 118, where an administrator who had paid a just debt out of its order, was not permitted to recover the money back, on the ground of mistake, from having over-estimated the assets. A creditor who has received satisfaction in the usual course, is not bound to refund, because the money cannot be followed except where it has been received *mala fide*. But the distinction between money which, if received *bona fide*, cannot be recovered back for want of privity, and specific property to which recourse, on the original right of the party, may be had in the hands of whomsoever it is found, is rendered familiar by the case of *Rapeljé* v. *Emory*, 2 *Dall.* 54, by which it seems to me, Mr. *Pepper*'s claim to exoneration, would have been frustrated, even had he first paid the purchase money into court, and taken it out again, having received the sheriff's deed. The legal consequences of the sale could not have been eluded by performing a ceremony that would have left the parties exactly where it found them. Mr. *Pepper* could not give himself a preference by purchasing under his own execution, for the same reason that a purchaser at an administrator's sale of the assets, can not set off a debt due him by the decedent in an action for the price, as was determined in *Wolfersberger* v. *Bucher*, 10 *Serg. & Rawle*, 10. Then if Mr. *Pepper* has obtained no preference, and the property is found specifically in his hands, it is not easy to see why the plaintiff may not have recourse to it on the ground of its original liability. The reason of the rule in the *Bank of Penn.* v. *Winger*, is that the money being incapable of pursuit, is irrevocably lost to some one, and consequently to him by whose negligence the loss was occasioned. Where, however, the property is accessible in specie, all loss whatever is avoided, by permitting the party entitled, to have recourse to it on his original right, the parties being, by this means, put on their original footing, and restored to their original title. My opinion, therefore, is that the residue of the mortgage debt, after deducting all that the plaintiff could have received from the proceeds of the parts sold on execution, as their contribution to the general charge, be levied, in the first instance, on the lots of *George Pepper*, and for

what may then remain unsatisfied, on the lot on *High* street, held by the heirs of *Charles Stewart.*

HUSTON, J.—Accustomed as I have been for some years, to hear every thing questioned, whether in politics, morality, divinity or law, yet the discussion in this cause was rather a matter of surprise, for as the main question had been at least four times solemnly decided, I had supposed it might have been at rest. I am not, however, dissatisfied, but pleased, that it had taken place, and will proceed to consider it on the acts of assembly, on the principles of law, on settled practice, and on authority, of our own decisions principally. When *William Penn* and our ancestors were preparing to leave *England,* certain general principles were agreed on; among which, one was, that a part of a debtor's lands should be liable to be sold for the payment of his debts, *viz.* one third. Soon after their arrival in this country, one half of the lands of a debtor was subjected to execution for debt, and in 1700, where no personal property was found, the whole. Athough this law is in a great measure superceded by that of 1705, yet it is proper to notice some of its provisions, nay to go back and cite another act, No. XL. of the year 1700, *Province Law,* page 3. It directs the county courts to appoint three sufficient, honest and discreet persons, to be appraisers in their respective counties, to value and appraise all such goods and chattels as shall be taken in execution by any process out of said courts, which goods shall not be sold until appraisement made, nor until seven days after, to the end the parties may be present if they see fit; that the sale shall be open and the overplus, if any, returned to the debtor; " and in case the said goods will not sell for so much as the same are appraised and valued to be worth by the appraisers, the creditor shall receive them for his pay, according as the same are valued and appraised, returning the overplus as aforesaid." The act for taking lands in execution, is No. XLVIII. of the same session, and found *Province Law,* pages 4 and 5. It enacts that all lands and houses shall be liable to sale on judgment and execution, where no sufficient personal estate is to be found; makes provision for delay of a year, where the messuage on which the defendant is chiefly seated, is levied on; and provides, that before any lands, houses or messuages taken in execution be sold, they shall be appraised by *twelve* honest and discreet men of the neighbourhood, and then it shall be lawful for the sheriff to make sale of, and convey the same under his hand and seal, after which sale and appraisement made as aforesaid, such lands and houses shall be, and remain *a free and clear estate* to the purchaser or creditor, to whom they are so made over or sold, his heirs and assigns forever, as fully and amply as *ever* they were to the debtor. Then comes a proviso that if the appraisement exceeded the debt, the creditor should be bound to take only so much of the land as paid his debt, and not bound to take the whole tract and pay his debtor the overplus. One of the counsel said, we should

leave out the word *ever*, and add after the word debtor, " when taken in execution," and to leave out the words *free and clear estate* altogether; it would then read, that the " lands should remain to the purchaser, his heirs and assigns as fully and amply as they were to the debtor when taken in execution." This, to be sure, would change the whole act as to its effect; it was not expected we should adopt this new reading.

Before leaving this act, I would remark, that the only difference between lands and chattels under the act first read, is, that the appraisement is to be by twelve men in one case, and three in the other, and that a deed is to be made of the lands. The purchaser got each equally clear, and so it would seem, did the creditor if they were delivered to him at appraisement. I doubt, whether at this time the idea of a judgment being a lien on lands more than it was on goods, had occurred to the legislature.

A former act on this subject was repealed by the queen in council; and in 1705, by act No. CXVIII. all estates held by sales under it were confirmed. This act speaks of sales under decrees in *courts of equity.* There was then such a court in the province. The act No. CXXXVIII. of the same year, again provides for the sale of all lands for payment of debts, where no sufficient personal estate was found. Under it and the act of 1700, we have acted ever since. I proceed to notice it particularly, first observing, that until the present, I do not know that this act of assembly has been ever referred to in any of the latter discussions of this subject. The first section having provided, that all lands and tenements may be sold for payment of debts, the second provides, that it shall not be lawful for any sheriff or other officer to sell any lands or tenements, which shall or may yield yearly rents or profits, *beyond all reprises*, sufficient within seven years to pay the debts or damages and costs of suit, but that all those lands, tenements, and hereditaments, shall by virtue of the writ or writs of execution, be delivered to the party obtaining the same, until the debt or damages be levied by a reasonable extent in some manner and method, as lands are delivered on writs of elegit in *England.*

If a judgment is not restrained for more than seven years by stay of execution, or a mortgage is due and payable within seven years, they both come within the meaning of the term, *reprises.* 1 *Yeates*, 477. We have no reported decision on the subject but this one, to my knowledge, but it was by the supreme court. In 1795, M'KEAN, SHIPPEN, YEATES and SMITH were the judges. Justice SHIPPEN came to the bar in 1753 or earlier; YEATES about 1760, and SMITH about 1770; of M'KEAN I cannot speak with certainty, but he had been chief justice nearly twenty years. I would add, that as the idea of a mortgagee recovering on ejectment before the last day of payment, had not been conceived then, perhaps, if an ejectment can be sustained on a mortgage at all, it ought to be taken into view, if any instalment will fall due within the seven years.

The third section provides, that if the rents will not pay the debt and costs within seven years, or if before the extent be out, another judgment or judgments be obtained against the said debtor, his heirs, executors or administrators, which together with what remains due on such extent, cannot all be satisfied within seven years by the rents and profits, the sheriff or officer shall certify this, on the return of such executions, whereupon a writ or writs of *venditioni exponas* shall issue to sell such lands and tenements for and towards the satisfaction of what *remains due on such extent,* as also towards the satisfaction of all the rest of such debts or damages in manner *as is hereinafter directed concerning the sale of other lands.*

Several reflections occur on this section. It supposes the land actually delivered to and in possession of the oldest judgment creditor; it supposes one or more judgments to be obtained afterwards, and so little idea had the makers of this law of selling land subject to incumbrances, that on a sale by a subsequent *venditioni exponas,* the land was taken from the first judgment creditor, and vested in the purchaser; and the first judgment paid first out of the proceeds, and the balance to the next judgment or judgments, evidently in the order of priority, for if the first had priority of the second, the second would have of the third, and so on. This is as plain as words could make it, unless the legislature meant, that the first judgment should be preferred, but after that priority in time should give no preference; yet there was a time when it was questioned, whether the first judgment should be paid out of the proceeds of a sale on a second, and there was a judge or two who said, it should not, nay it could not be so paid; this opinion, was put down, not because it was contrary to the express words of the law, but on account of uninterrupted usage. The law was not recurred to.

The next observation is, that the satisfaction was to be in manner as is directed thereinafter, concerning the sale of other lands; there are two directions thereinafter, which I proceed to notice.

The fourth section consists of two parts: The first says, it shall and may be lawful for the sheriff or other officer by a writ of *levari facias,* to take and seize *all other lands,* tenements and hereditaments in execution, and thereupon with all convenient speed, either with or without a *venditioni exponas* to make public sale thereof, for the most they will yield, and pay the price or value of the same to the party towards satisfaction of his debt, damages and costs, and then proceeds to direct the mode of advertising, selling and making the deed, and acknowledging it *for what is sold* as has been heretofore used on a sheriff's sale of lands. Then comes a clause in the alternative; if the lands cannot be sold, the officer shall so return, and this shall not make him liable, but a *liberari facias* shall forthwith be awarded, commanding him to deliver to the party such parts of the lands, tenements and hereditaments as shall satisfy his debt, interest and costs, according to the valuation of twelve men, to hold to him as his free tenement in satisfaction of his debt, &c. or so

much as they will satisfy; and if they fall short, he may proceed against the defendant's body, goods or lands for the residue of his debt; all which said lands, tenements and hereditaments so as aforesaid sold or delivered, by the sheriff or other officer, shall be held and peaceably enjoyed by the person or persons, or bodies corporate, to whom the same shall be sold or delivered, his or their heirs, successors or assigns as fully and amply, and for such estate and estates, and under such rents and services as he or they for whose debt the same shall be sold or delivered, might, could or ought to do, at or before the taking thereof in execution.

This section was read by the counsel for the plaintiff, but not much commented on: the last sentence particularly was read. I might content myself by saying, that in no respect has it ever been acted on so far as we know, and therefore might be left out of view. There is, however, an apparent incongruity, and only an apparent one, which calls for notice. By the two preceding sections no land could be sold without an inquest, to ascertain whether the rents would, beyond reprises, pay debt, interest and cost in seven years, or without a *venditioni exponas*. By this, *other lands* might be sold without either, on *levari facias*. Could a party plaintiff by giving his *precipe* for *levari facias* instead of *fieri facias* evade the former sections? Certainly not. The plain meaning, though not explicitly expressed, in the preceding part of the act, contemplated and referred to estates in fee simple, or at least of inheritance, and the *other lands* mentioned in this section, are lands in which the debtor had not an estate of inheritance, or not in possession, as a remainder or reversion, which might not come into possession for seven years. These have been sold and no inquest is necessary. 1 *Yeates*, 427. The remaining clause of the section only applies to this kind of estate in lands, what had been enacted as to chattels, by the act first cited, and to all lands by the act of 1700, *viz.* that, when levied on, they should be appraised, and if they could not be sold for the amount of the appraisement, they might be delivered to the plaintiff in discharge of his debt; and whether *sold under this section* or *delivered*, they should be held by the purchaser or the creditor under the *same rents and services*, and for the same estate as the debtor held them at the time of issuing the execution. I shall not stop to inquire, whether this section was intended to comprise estates in tail, or for the debtor's own life, or for the life of another, or leasehold interests, or all of them, and if not all, which of them. *Rents and services* are not incumbrances; all lands granted by the proprietors were subject to *rents or services* to *him and his heirs*, and several acts of assembly had settled, that these could not be separated from the lands except by his release; nor shall I inquire, whether on the sale under a judgment and execution, of an estate for life of the debtor, or which the debtor held for the life of another, there was, or is, any lien of judgment or preference of a prior to a subsequent judgment. I mean, whether there would have been such preference; this act seems to settle the matter since its passage. This

(Presbyterian Corporation *v.* Wallace and others.)

section then relating to other matters, and not to the sale of estates of inheritance of lands by *fieri facias*, inquisition, and *venditioni exponas* may be laid out of the question.

The sixth section provides for sales on mortgages in the courts of law, not because there was no court of equity, for I have mentioned a law of the same year which referred to it, but because mortgages had been given for securing the payment of money, and where the mortgagor neglected to pay, rents were so low as to make them no adequate or effectual security *for payment of money;* lands were plenty; money scarce. *Wm. Penn,* in 1702, had offered a square in this city to his coachman instead of sixteen pounds, his wages, and it had been refused; had offered another for twenty pounds, though situated between *fourth* street and the *Delaware.* There is another reason; the mortgagee in possession is the tenant of the mortgagor to all intents and purposes; he must account for the rents and profits; if he improved the land and increased its yearly value, it was a means of paying himself to be sure, but the improvements inured to the benefit of the mortgagor. As soon as rents and profits paid the mortgagee's debt, the mortgagor could turn him out, to go and clear and improve another wild farm for himself. By this section it was enacted, that on the expiration of one year after the whole money secured by the mortgage was due, the mortgagee might sue out a *scire facias* to be served on the mortgagor to appear in court, and show cause, if any he could, why the mortgaged premises should not be *taken in execution,* and the defendant might appear and plead *satisfaction or payment of part or all the mortgage debt,* or any other lawful plea in avoidance of the deed or debt. The act proceeds to give directions, that upon a final judgment, the plaintiff shall have execution by *levari facias* directed to the proper officer, by virtue whereof the mortgaged premises *shall be taken in execution* and *exposed to sale in manner aforesaid,* and upon sale conveyed to the purchaser, and the money or price rendered to *the mortgagee or creditor.* It then proceeds, in case this land cannot be sold, that it may be delivered to the mortgagee or creditor in manner as hereinbefore directed as to other lands, " and when the lands and hereditaments shall " be so sold or delivered, as aforesaid, the person or persons, to whom " they shall be so sold or delivered, shall and may hold and enjoy the " same with their appurtenances, for such estate or estates as they were " sold or delivered, clearly discharged, and freed from all equity and " benefit of redemption, *and all other incumbrances* made or suffered " by the mortgagors, their heirs or assigns; and *such sale shall be avail-* " *able in law,* and the respective vendees, mortgagees or creditors, their " *heirs and assigns* shall hold and enjoy the same *freed and discharged* " as aforesaid; but before such sales be made, notice shall be given in " writing in manner and form as is above herein directed concerning " the sales of lands upon executions." Then follows a proviso, that if the lands sell for more than will satisfy the debts and damages and reasonable costs, then the *sheriff or other officer who made the sale, must*

(Presbyterian Corporation *v.* Wallace and others.)

*render the overplus* to the debtor or defendant; and then, and not before, shall the officer be discharged thereof upon record in the same court where he shall make return of his proceedings concerning the sales.

It is possible, that in practice, in the progress of society, and the complicated business of modern times, cases may have occurred which were not foreseen by the framers of this act. It was not then usual to spin a law out to the size of a pamphlet. If the general object and intent of the law was made plain, it was left to the courts to regulate the details of practice, and the application of the principle. I have not learned that in any instance the lands were delivered, at the appraisement of twelve men, *to the creditor* in satisfaction of his debt, unless for seven years, under the first sections. A difficulty certainly would occur in giving lands in satisfaction of his debt to a younger mortgagee, which were bound by a prior mortgage or judgment, and giving them clear of incumbrances too. And it is probable this difficulty caused those provisions to remain a dead letter. There was no difficulty in applying the money.

It has been most perseveringly insisted on in this case, that

1st. The mortgage was a conveyance in substance as well as form: that the mortgagee, to use the unfortunate expression of the late chief justice, *had the legal estate in the land.*

2nd. That the mortgage was a contract which the legislature could not alter.

I shall first consider these under the section just read. Taking the mortgage to be a contract binding according to its terms, or taking it that the mortgagee had the estate in fee simple after the day of payment was passed, the section in question is worse than nonsense. Who ever imagined that a law was necessary to give a man what he already had the legal title to? Or why bring a suit and have a trial, and issue execution, and advertise and make a deed, and acknowledge it in open court, to give a man what was his own before? Or why issue a *liberari facias,* and collect and swear twelve discreet men to decide how much a man should pay to a mortgagor in order to have liberty to keep what, they say, was his own before? The legislature say it was a security for money, and an inadequate one, and provide for selling it as the property of the debtor. If before that law, the words grant, bargain and sell, *in a mortgage,* had passed the fee; if the estate had theretofore become absolute when the day of payment was passed, this act alone would have changed the law; but it was not so; a mortgage did not change the estate though the debt was not paid at the day, or for years after. Then, and yet, this form is used. And so a bond is given for two thousand dollars to be void on payment of one thousand dollars at or before a certain day, *otherwise to remain in full force and virtue.* Yet no lawyer, no man, no woman, is mistaken as to the effect of either of those instruments. They are not what the words import; they are what the

law, and the universal understanding of all people, make them. It is strange we should now be told otherwise.

In 1705, then, the mortgage was a security for money; the legislature call it so. As between the mortgagee and mortgagor, the mortgage was in form a conveyance of the land. In *England* it was so in a court of law for some purposes, *to wit*, for giving right to possession; but the mortgagee in possession had in chancery to account for the rents and profits, and when they had paid his debt, his estate was gone; so completely so, that if he continued in possession afterwards, he must pay the subsequent rents to the mortgagor. The widow of the mortgagee had not dower; the mortgaged premises did not go to the heir, but to the executor; was not real estate; the mortgage was a debt, or security for a debt; it was a chattel. The legislature here transferred the power over it to the courts of law; they treat it as a debt; the plea to it is payment; they treat the lands as the property of the mortgagor; they are to be levied on, advertised and sold as his; are to be clear, and free from all claim by him, and discharged from all incumbrances done or suffered by him; and to him the residue of the purchase money after payment of the debts is to be returned.

What right was given to the purchaser? By the first section, if sold on a younger judgment, the elder judgments were to be first paid off. By the sixth section, if sold on a mortgage, all incumbrances were to be paid off, for the land was to be held for such estate, as they were sold clearly discharged and freed from all incumbrances made or suffered by the mortgagor. A mortgage, if prior, was an incumbrance and nothing more. If then it was sold, as it might be, on a second mortgage, a prior mortgage must be paid, or it would not be clear of incumbrances. The express case of mortgaged lands being sold on a subsequent judgment is not put in the law; but it was no stretch to decide them to be on an equal footing; both were incumbrances; on executions issued upon both, lands will be sold, and there is nothing pointing to any difference in the title of the purchaser.

It has been much pressed that this law was made for the benefit of the mortgagee. It was so; but not solely for his benefit; it gave him a remedy which he had not before, but it also gave to the mortgagor a benefit not his before, the right to the overplus, after payment of all incumbrances; and it had regard to other persons, by providing that prior incumbrances should be first paid, and subsequent ones too, before any money was returned to the debtor defendant. In short it turned the land into money, and divided the money among those who had liens according to their rights. On what ground could a different construction have been made? There was no instance in the law, in which the law had ever sold either goods or land in which it did not sell it clear of incumbrances. If it was the debtor's before sale it became the purchaser's after sale, without regard to who got the price paid for it.

(Presbyterian Corporation *v.* Wallace and others.)

The object of all laws must be to do equal justice to all. A public sale clear of incumbrances would bring the best price; when that was obtained and paid according to right, neither any creditor nor the debtor was injured.

Every mortgage is accompanied by a bond or note. This bond or note may be sued, and judgment obtained on it. Suppose land sold on execution subject to a mortgage; then it will not bring so much as if sold clear of the mortgage, by the amount of the debt secured by the mortgage; but the mortgagee is not bound to proceed on his mortgage; he may proceed to get, or may have got judgment on his bond, and on it proceed to sell the personal estate of the debtor. No court has, and no court can interfere to prevent him. A court of law cannot, nor a court of equity, unless he is so situated as to be obliged to ask their assistance. A purchaser may then buy subject to the mortgage; may not have to pay that mortgage, and the debtor or his other creditors cannot compel the purchaser to pay the amount of the mortgage, or any part of it, to them.    1 *Lyle* v. *Ducombe*, 5 *Binn.* 585.   1 *Yeates,* 9. 189.   9 *Wheat.* 500.

A mortgage may be secured by several houses, or tracts of land; it may be due and sued, and judgment on it, but the creditor will not sell. It may be, that sold clear of incumbrances, any one of the houses will pay the mortgage. Another person has a judgment subsequent to the mortgage, and he *must* get his money; he proceeds to sell; what will the purchaser get? An estate at the will of the mortgagee, and which can be again sold on the mortgage next court —it will not bring half a year's rent. Another is set up and sold, but the mortgage may be levied on that; the mortgagee is not bound to take the first; the second then sells at the same price, and so a third, a fourth, a fifth; five tracts are then sacrificed by this mortgage, and the judgment creditor has hardly got his costs; his debt is but little reduced, and the defendant is ruined. His other creditors, if he has any, or his family, may starve. I will suppose the mortgagee to mean no advantage: he proceeds to sell, and the first property pays his debt: the purchasers of the other four get each a house for nothing.

But suppose the mortgagee and the subsequent *judg*ment creditor to join to plunder a debtor; after all the mortgaged property has been sacrificed as stated, the mortgagee may get judgment on his bond, keep it duly revived, and as often as a debtor acquires a little property, take it by *fieri facias* or *testatum,* or by debt on his judgment in another state.

Again, suppose the mortgagee will do none of these things; the judgment creditor may get judgment and sell, while the mortgagee is proceeding with all expedition to get his mortgage made a judgment; and the judgment creditor himself purchases all the houses or lands comprised in the mortgage, and has got each of them for a year's rent; he is able to purchase the bond; he then gets four or five times as much property as would have paid his own debt, and

the mortgage both, if sold in the ordinary way : nay, may use the bond to collect its amount from other property. It seldom happens that a man indebted by mortgage to one man, and judgment to another, has not other creditors ; they fare as the debtor does, all goes from them. , This matter may be pursued in the mind much farther, and in every way it is calculated to give undue advantages to a few to the ruin of others. Let it not be said no one will do what is here supposed possible. There are in every country in the world, and in every county in this state, men of property who, to get more property, will do any thing and every thing which will increase their wealth, and not subject them to punishment in the penitentiary.

There is another matter in this section: when a sale is made, the money is to be paid to the mortgagee or *creditor;* for want of buyers it is to be delivered to the mortgagee or *creditor;* such sales shall be available in law, and the respective vendees, mortgagees, or creditors, their heirs and assigns, shall hold and enjoy the same, freed and discharged as aforesaid. I know the plaintiffs say, the word creditor means in each case exactly the same as mortgagee, that is, the same person by another designation, an *alias dictus;* if so, it is a useless tautology; but when we find that the purchaser is to hold clear of incumbrances, the plain and natural meaning of the word creditor is, prior incumbrancer. The money is to go to the mortgagee, if no creditor has a prior incumbrance ; if any one has a prior lien, the money goes *to that creditor.* The vendee, his heirs and assigns, are to hold the purchased property, freed and discharged as aforesaid. And the last section of the act provides, that if any of said judgments, which do or shall warrant the awarding said writs of execution, whereon any lands have been or shall be sold, shall be reversed for error, none of the lands, tenements or hereditaments taken in execution and sold, shall be restored, nor the sheriff's sale avoided, but restitution, in such cases shall be made only of the money or price for which such lands had been sold. Nothing could more strongly prove the determination of the legislature, that the purchaser should have an indisputable title, than this clause. If the meaning had been that the purchaser took, subject to any prior lien, that his estate could be divested by a sale on any prior judgment or mortgage, this clause was worse than useless; it is a mockery; it is deceptive. By the *seventh* section, the *sheriff* is to pay the debts and costs, and then the *sheriff* is to return the overplus to the debtor. The purchaser has nothing to do with it ; he and his heirs and assigns are to have an estate *available in law, freed and discharged from incumbrances;* not to be affected, though the judgment or proceedings are irregular, erroneous, reversed. Can any one seriously believe all these provisions were unmeaning, nay, a mere trap to catch the purchaser's money and give him no right, or one which could be taken away by any person who had an older incumbrance, and who had not been paid by the sheriff?

Lands had not been subjected to sale, for payment of debts general-

ly, until they were in this country; but chattels, and leasehold interests had; and lands in case of bankruptcy; and on sales directed by the Chancellor. They were by the acts cited made chattels for the payment of debts; to be sure they were not sold in every respect as chattels; more form was prescribed; but was there intended to be, or was there any reason why there should be any difference as to the absolute disposal of the debtor's right and the giving a clear title to the purchaser? I have not been able to discover either. Chattels were first bound from the *teste* of the writ; then from the delivery of the writ to the sheriff. After receiving one writ, the plaintiff in that writ had a lien on the debtor's goods, *i. e.* a right to be paid his debt out of the proceeds of them when sold. The sheriff, however, did sometimes sell the goods and pay the proceeds to the plaintiff in a subsequent execution. No one has ever yet pretended the plaintiff in the first execution could follow the goods and take them from him who bought them at the sale by the sheriff. A ship may be mortgaged at sea, and all muniments of title fairly given to the mortgagee: on her return she may for other debts be libelled in the Admiralty, or before the mortgagee can take possession, may be levied on in execution. When sold according to law, the prior lien takes the money, whether that lien is seamen's wages, a bottomry bond, or mortgage; and this whether sold by order of the Admiralty, or on the execution. I know of no case where, when once sold by process of a court having jurisdiction, she has been again sold by process of the same court, or of any other court in the same country, for any debt of her former owner.

In case of bankruptcy, after the act of bankruptcy committed, an execution may be given to a sheriff, who sells the goods. The sheriff is liable for the price at which the goods sold, which may be recovered by the assignees, but the purchaser of the goods from the sheriff, is safe; but he who purchases goods from the bankrupt himself, at private sale, after bankruptcy, or at least after commission issued, cannot retain the goods. The lands of a bankrupt are sold by the assignees; it must have happened that the assignees in some cases have misapplied or squandered the money produced by such sales; has it ever been attempted to sell the lands over again, from the purchaser?

Formerly, in complicated cases, the chancellor decreed a sale; did he ever decree a sale subject to a judgment or to a mortgage? Of late years I believe there is no instance of a foreclosure where it is alleged the mortgaged property will sell for more than the debt; and instead of a foreclosure, a sale is ordered; and when the money is raised, it goes to judgments or mortgages according to their order. I am not aware that land sold by order of a chancellor, was ever sold subject to a judgment or a mortgage, or was ever held to be subject to one in the hands of the purchaser. But he gives notice to all parties, say the plaintiffs; so does our law, as I shall show, as effectually and generally, in the same way as a chancellor does. It was then to be expected, that from analogy to the law, as it had been understood in

(Presbyterian Corporation *v.* Wallace and others.)

similar cases, as well as from its expressions, and from a regard to general convenience, it would be settled that the purchaser held clear of all incumbrances. Was it so settled from the earliest times to which we can go back? Until since the Revolution, we have no reports of the decisions of our courts; but Judges SHIPPEN and M'KEAN were at the bar about 1750. They would be acquainted with lawyers and judges of twenty or thirty years standing, and with the usage and decisions, and general understanding as to all matters of constant occurrence, as well from their own observation, as from the conversation of elder lawyers and judges. Our laws had directed that lands of a deceased person should be liable for his debts; whether they were liable in the hands of a person to whom an heir or devisee had sold them, would seem also to have been well settled. The first reported decision on the subject is found in 1 *Dall.* 481, *Graff* v. *Smith's* administrators. Judge SHIPPEN, President of the Common Pleas, went at large into the question. He decided they were liable; he says, the hardship on purchasers, may, in particular cases, be very great; where there has been any suspicion of outstanding debts, it has been very *usual to make the purchase under an execution.* This was in 1789. In 1793, the matter was brought before the Supreme Court, 1 *Yeates*, 238, *Morris' Lessee* v. *Smith.* It was decided in the same way. M'KEAN, Chief Justice, quotes an opinion of Chief Justice CHEW before the Revolution, in which he says, such had been the constant practice. SHIPPEN, Justice, after referring to his former opinion, says, " While in every province around us, the men of wealth and influence were possessing themselves of large manors, and contriving means, and procuring laws to transmit them to their eldest sons, the people of *Pennsylvania* gave their conduct and laws a more republican cast, by dividing the lands as well as the personal estate, among all the children of intestates, and by *subjecting the lands in the fullest manner to the payment of debts.* There was a time within my remembrance, when lawyers held, that common recoveries for docking estates tail could not be legally suffered in *Pennsylvania,* and the first that was suffered will be found in my handwriting when a young student. The practice, however, was not generally adopted until the passing of the act of 1750, which expressly authorised it. As lands by means of entails were before this time and act rendered unalienable, the only way of docking them was by the instrumentality of the very acts of assembly now under consideration, (the acts of 1700 and 1705.) *Nothing was more common, and it was every day's practice* for lawyers to advise the instituting suits against the executor of testators (perhaps many years after his death) for the sole purpose of taking the entailed lands in execution, and barring the entail. Many lands are now held by these titles. There was but one opinion on the subject. The *acts of assembly were taken in the utmost latitude for the purposes of making lands responsible to creditors.*" He goes on in the same strain; says, inconveniences are said to have arisen in modern times: That the legislature can alter the

(Presbyterian Corporation *v.* Wallace and others.)

time of the lien, but it is no reason why a court should overturn a construction, which has prevailed nearly a century.

In 1 *Yeates,* 75, we find *Scott* v. *Croasdale.* This case decided, that the dower of a wife was barred by a sale on a mortgage executed by the husband alone, after the marriage. The defendant's counsel were stopped by the court, who say this point was too clear to bear an argument. Lands in *Pennsylvania* by the policy of the legislature were made assets for the payment of debts, and the present case cannot be distinguished from a sale on a judgment *fieri facias* and *venditioni exponas;* and the chief justice says a similar decision was made thirty years ago, when the opinsons of several eminent counsel were read concurring with the opinion of the court. This last case did not turn on the fact, that the lands were sold for the payment of the husband's debts solely, but that they were sold by process of law. A sale to trustees with power to sell for the payment of debts, and a sale by the trustees and the payment of debts do not discharge the lands from a widow's dower, 2 *Yeates,* 300.

I am aware, it may be said, that none of these cases are directly to the point, that that they do not directly decide, that any of these sales would have discharged a prior mortgage, but they prove what is equivalent, nay stronger. A fine or common recovery in *England* extinguished all claims, outstanding titles and liens, and vested a clear and indefeasible title according to the intent of the parties; at the time spoken of in the above cases, a sale on an execution was supposed to have the same effect. Each creditor of a deceased had a lien on his lands; a right to recover his debt out of the proceeds of those lands when sold; and each had a right to proceed and sell the lands, but if one of them obtained judgment and sold, the lien of all the others was divested, and the purchaser took the lands clear of all claims.

The lien on the land became a right to the money produced by the sale of it; and so little was the payment of the money to the creditor regarded, so much was he compelled to look to the sheriff, that the sale when made to dock an entail was as much a fiction as the common recovery or fine in *England.* No matter how long the ancestor had been dead, find a claim against him or fabricate one; find a surviving administrator, or make an administrator *de bonis non;* institute a suit and confess a judgment, and sell the lands and all liens, entails, claims, and even errors in the proceedings were at an end; and the purchaser had an available title, clear of all incumbrances. But the manuscript note of Judge SHIPPEN of the case of *Febiger's Lessee* v. *Craighead,* which has been read to us, goes to the very point. Mr. *Lewis* had stated the practice, and he was not a young lawyer, to a court of old men and great lawyers; the oldest lawyers in the state were examined, and say, (and SHIPPEN there puts down as his knowledge and his opinions,) That the usage had been to sell absolutely and pay all judgments and mortages: That it was immaterial to the purchaser, whether they were prior to the

one on which it was sold or not.   The purchaser took clear of both judgments and mortgages, and the sheriff must look to the application of the purchase money.   In 3 *Yeates* 561, was an application to set aside a sheriff's sale, because the property had not been sold subject to the mortgage; the sale was not set aside, but several of the judges spoke doubtfully, as to whether the purchaser under a younger judgment, took the lands discharged of a prior mortgage.

1 *Binn.* 97.  The sheriff returned, that he had applied the money produced by a sale of lands to the payment of several judgments and mortgages, and charged poundage on the money so paid.   The court decided, that the sheriff had uniformly been allowed poundage upon the payment of *prior judgments and mortgages*, and gave it to him in that case.  No doubt was suggested as to his being bound so to apply it.  In 2 *Binn.* 146, we find *Bartleton* v. *Smith.*  In that case lands were sold on a judgment.  Arrears of a ground rent of sixty dollars per annum were due; it was a ground rent in fee, and it was decided, that all rents due up to the sale must be taken first out of the purchase money. I have only to notice so much of the case.   The owner of the ground rent had a covenant from the tenant to pay, a right to distrain, and to enter in default of payment; he had as much, nay vastly more right, than any mortgagee.   On what ground was the money awarded to him?   His right bound the land, and as to rents hereafter to accrue, ran with the land.  It was because the purchaser at sheriff's sale is to get the land clear of incumbrances.

2 *Dall.* 131. *Nichols* v. *Postlethwaite* had decided, that when the sheriff sold land, on which a legacy was charged, the legacy must be paid on the same principle.  3 *Binn.* 358, *The Bank of N. A.* v. *Fitzsimmons*, stated it to be the settled practice, and of long standing, to sell clear of incumbrances.  Same point arose in *Young* v. *Taylor*, 2 *Binn.* 218, though the same doubts were expressed by some of the judges.

In 4 *Serg. & Rawle*, 509, we find *Gause* v. *Wiley*, which may be a proof of Judge Shippen's statement, that sheriff's sales were used formerly to dock entails.   Or it may be (for the facts are sparingly stated, and the original record of the sheriff's sale defective) a case, in which what was supposed a fee simple, was sold for a debt of the owner.  It was decided to be an estate tail, and yet the sale was held valid, on various grounds I acknowledge : it contains, however, somethings worthy of notice here.   It is distinctly stated, that a devisee whose legacy is charged on land, might bring ejectment and recover the land, and hold till paid, and that such had been the practice. No action on the case, or of debt had been used before that year.   I well remember, when a student in 1793, 4 and 5, being so instructed, and the reason of the practice given as in *Gause* v. *Wiley;* also in page 535, Judge Duncan cites *Nichols* v. *Postlethwaite*, and says, *the charge operates as a judgment, and sheriffs in the sale of lands are bound to take notice of it.*

In 7 *Serg. & Rawle*, *Kauffelt* v. *Bower*, page 82, Duncan, Justice, says, there is nothing in this state to distinguish a judgment from a

(Presbyterian Corporation *v.* Wallace and others.)

mortgage, except that a mortgage is specific, *i. e.* binds particular lands; a judgment is general, *i. e.* binds all lands in the county.

In the same book, page 286, we find *Semple* v. *Burd*. This case led to an examination of the nature and effect of a mortgage and a judgment. The case depended on this, was important from the amount of property, and though we have not a report of the argument, was fully and ably argued, and the decision is: a judgment during five years, and longer if duly revived, binds the lands of a debtor as a mortgage does; comes in on a sale by the sheriff, equally with a recorded mortgage; they are paid according to their priority without regard to their quality, and the Judge says, the judgment gives the creditor a general lien, the mortgage a specific one. This is the only difference, for a mortgage *is but a security for the debt, specific and limited. The judgment is unlimited: the securities are equal.*

In 9 *Serg. & Rawle*, 302, *M'Call* v. *Lenox*, the land was sold on a judgment recovered on the bond, to secure which a second mortgage was given. The sale was general of the house and lot; the price enough to pay the first mortgage and only part of the second; but there it did not occur to the counsel or court, that the money bid must go to the second mortgage and judgment, and the purchaser take subject to the first mortgage. The dispute was on another point not necessary to be mentioned here. The money was appropriated according to what C. J. TILGHMAN calls an ancient practice, to sell the land for its full value, and appropriate the money to the liens according to their priority. GIBSON, Justice, says, the purchase money although collected on the bond, will be paid to the mortgage as an existing lien, when it happens to be the oldest, just as if the bond and mortgage had been for distinct debts due to different persons. DUNCAN, Justice, goes fully into the nature of the mortgage and judgment, and the effect of the sale, agreeing as to these matter with all prior decisions.

14 *Serg. & Rawle*, 257, *Comm'th* v. *Alexander*, was a suit against a sheriff by the commonwealth for the use of *Gurney's* executors, because having sold the lands, he did not pay the proceeds to them. *F. Gurney* obtained a judgment against *William Patton* on a bond and warrant of attorney, payable on a day posterior to the sheriff's sale hereafter mentioned. This judgment bound many tracts of land. *William Patton* sold one tract to *Maxwell*, who became indebted to *Fahnestock & Co.* A judgment, levy, and sale of this land took place. *Alexander*, the sheriff did not pay this money to *Gurney's* executors, and they brought suit on his official bond. Judge REED decided, that the sheriff was not liable, and he used most of the arguments, which we have heard here, and which apply as forcibly to a prior judgment as to a prior mortgage. TILGHMAN, C. J. says, the judge decided, that the purchaser took the land subject to *Gurney's* judgment. I cannot assent to this opinion, because the principle on which it is founded, would work the most ruinous injustice, in all cases where the purchaser at sheriff's sale, paid the full value of the land, and is, I think, contrary to ancient practice and express adjudication. I shall

not cite his whole opinion. He recognises *Burd* v. *Semple*, "that on a sheriff's sale, liens are paid according to their priority, without regard to their quality." Also *Nichols* v. *Postlethwaite*, where a legacy charged on the land was paid, and adds "*on the same principle the judgment creditors of the ancestor, had there been any, must have been let in.*" It is true, he waives deciding as to any case, which may arise between mortgage and judgment creditors. This case makes no distinction between an incumbrance suffered by the present owner, and one by a former holder of the land, or rather is an express opinion, that there was none, and he cites *Nichols* v. *Postlethwaite* as having gone on that principle, and establishing it.

There is another case to be noticed, 1 *Dall.* 142, *Dorrow* v. *Kelly*. Originally in *England* the mortgage was what it appears to be on its face, a conveyance of the land absolutely, and only to be rendered ineffectual by payment on or before the day. So at that time the penalty of a bond was recoverable in a court of law unless payment was made on or before the day. When equity interfered as it did in both cases, it considered the judgment creditor or mortgagee as having each a right at law, and it would not interfere to deprive the mortgagee of this legal right, except upon terms of complete justice, according to their notion, being done. Hence, the mortgagor was required to pay to the mortgagee not only the principal and interest due on the mortgage, but other debts. It may be safely said, if the law on this subject were now to be settled in that country, it would be settled differently. In the case cited it was attempted to *tack* certain other debts to a mortgage. The court refused this; which if the mortgagee had the legal estate, could not have been refused. " The act expressly confines the remedy on the mortgage to the recovery of the principal and interest due on the mortgage ; and the proceedings under the law show the uniform construction of it." And again, " We might as well refuse to stay proceedings in a suit on a single bill, till a subsequent debt was discharged." This decision has never been questioned until now, and nothing can more clearly negative the idea of a mortgagee having any legal or equitable right beyond his debt and interest.

*Lyle* v. *Ducomb*, 5 *Binn.* 585, is the case of a prior mortgage, and mechanics' lien for houses built on the mortgaged premises. Of so little importance was it then considered, whether the money was raised by a sale on the mortgage, or an execution on a judgment, that it is not expressly stated in the case. There, however, no question was made whether, if the mortgage was a lien, the money should be paid to the mortgagee ; no one thought of the purchaser taking the property subject to the mortgagee ; yet it was a favourable case for it, as the mechanics' lien was for houses built on the lot, after the mortgage.

There was a part of this state, however, in which, for a time, the law was held otherwise ; I mean Judge ADDISON's district; and Judge BRECKENRIDGE repeatedly asserted that the purchaser took subject

to prior judgments and mortgages; he made no difference. Other judges for a time affected to doubt; but all decisions were one way; all report of practice was one way. The judges I have named were at the bar or on the bench, eighty years ago, and up to this time no one of them, as counsel, brought a case, or as judge, decided as the plaintiffs contend for. Forty years ago, SHIPPEN said, the legislature might change the law, but courts could not.

*Moliere* v. *Noe*, 4 *Dall.* 450, has been cited as the express opinion of another judge. The point decided by the court in that case is clearly right, *to wit,* that a sale by an order of the Orphans' court, discharges lands from the lien of a judgment which bound it in the lifetime of the intestate; but that as to lands bound by judgments in the lifetime of the intestate, the order of lien continues the same after his death, and if duly revived, they are to be paid in the same order as if money was raised in his lifetime; and that it makes no difference in this respect whether the lands are sold on execution, or by order of the court. The XIV section however does not apply to such a case, but to money raised from personal estate, or lands not bound by any judgment, and only to cases of insolvent estates. Now, as it did not release lands bound by a judgment, from the lien of that judgment, so it does not release lands bound by a mortgage, from the lien of that mortgage; but if it is the oldest lien, it must be paid first out of the proceeds of lands within it, and afterwards comes in as a specialty on personal funds. Such I think was, and is the opinion of every lawyer, and such I know was afterwards the opinion of Chief Justice TILGHMAN.

This case, and some doubts scattered through our reports, produced the worst effects. Lawyers, speculators, spoke doubtingly, though they had no doubts; purchasers were sometimes frightened off; it was not unusual for a man to buy at a sheriff's sale, knowing well enough that the title was good, but expressing many doubts until the property was knocked down to him; and then to sell within a week with warranty against all claims, for one-third or one-half more than he paid. This was ruin to debtors and to creditors; it was a disgrace to the administration of justice. The law ought not to be doubted in an every-day occurrence. If every court in the state awarded the money to the oldest lien, whether debt of ancestor, or legacy, or mortgage, or judgment, or mechanic's lien; and no lawyer took a writ of error or appeal, no decision of the Supreme Court could be had on the express point, and our reports could show none; if, however, whenever any matter occurred, our courts gave decisions which could not have been made unless the law was in a certain way, they are pertinent, and as conclusive as an express decision on the point. A construction of a law affecting real estate, adopted immediately after its enactment, sanctioned by courts, acted on by all persons, and according to which, a large portion of landed estate was held, became a rule of property, as binding as if it were a part of the text of the law. No court can change it without unsettling titles for

twenty one years back, and putting the whole state into confusion. I have endeavoured to show that the construction in question followed the words of the law, or was conformable to its spirit; was adopted before the time of which we have regular reports; has been uniform as to decision; at most doubted, but never in any one case overruled; never questioned for nearly a century; then discussed, as all things are discussed in our day, but still followed.    When *Willard* v. *Norris* came before this court, it was our duty to meet and decide the point; to have evaded it would have been a dereliction of duty; to have decided it otherwise would have been against all principle and all practice, and would have done infinite mischief.    A court cannot change the law as to titles for the future, without affecting all the past, which are not protected by the statutes of limitation; but this court felt no disposition to change it.    That a case may occur in which those who may neglect their business shall lose, is no reason for changing the law.    That one isolated class of the community may believe a change would give them advantages, which at present they have not, is no reason for changing a course of decision, if the change would operate injuriously on another and more unprotected part of the community.    The legislature have changed it from the time of the late act.    That leaves all past transactions as they were.    Time will show the advantages or disadvantages of the change.

But it has been argued, that where the money is not due on the judgment or mortgage, the court has not power to compel the creditor to accept of it before the specified day of payment.    This is not that case; for the bond and mortgage were payable *on* or *before* the ———— day of ———— 1821.    I will not rely on that however.    There are many cases in which a creditor must take money before he could compel the payment of it.    Under the laws on domestic attachments, insolvent acts, bankrupt laws, and some others, the assignees pay all debts due, and to become due, and ascertain the amount by calculation.    Every creditor by judgment or mortgage has a right to apply to the law to turn land into money, for the purpose of paying his debt.    *The Commonwealth* v. *Alexander*, 14 *Serg. & Rawle*, 257, has decided, that this may and must be done, and that a judgment creditor whose debt is not due must take his money or let it lie in court.    A mortgagee must do so too.

If ever the time shall come when bonds or mortgages are made payable at a distant day, and not before, it will be time enough to decide on such a case.    A judgment or mortgage payable fifty, or a hundred, or five hundred years hence, and not before, is so like a perpetuity, may be managed through the intervention of trustees, or by and through corporations, in such a way as to enable a man to make a very lasting provision for his family; for a judgment debt or a mortgage cannot be levied on or sold for the debts of the creditor. Legislatures and courts too have prevented perpetuities in landed estates, against the will of the wealthy, and I *guess* they will not

permit them in personal estate, the evil and injustice of which will be as great as in land.

The authority of the Supreme Court of the United States has been resorted to, and *Thellusson* v. *Smith*, 2 *Wheat.* 396. *Conard* v. *Atlantic Insurance Co.* 1 *Peters*, 386, and 12 *Wheaton*, 177, have been cited. No man who respects learning and talent, directed by patient industry, can do other than respect that court. It is not possible, however, that it can know the particular enactments of each state, and what is of equal importance, the construction put by usage and time on those enactments, as well as the courts of the several states. Aware of this, they follow the state decisions as to titles, where they know them. The nature and extent of liens on land, are perhaps different in every state in the union.

A judgment in *Pennsylvania* gives the owner a right to its amount whenever the land is sold by any legal proceeding, and the right does not depend on, nor is it increased in the smallest degree, by issuing an execution. Private sales by the debtor leave the land subject to a judgment against or mortgage by the seller. Sales by judicial process, no matter from what court, turn it into money, and the liens, whether by judgment or mortgage, are paid according to priority; there is no other difference. It never was material, and never was inquired in this state, whether an execution had or had not issued on the first judgment, which though it did not give a right to the land, yet gave a right to the money when the law had turned the land into money. The first judgment creditor applies to the officer who sold, or to the court for it; he sues the officer for it, and recovers it; nay, recovers it from the officer and his sureties, if it has been misapplied. What is said in the above cases proves that I state the law as it has been held, always held, in this state. The decision then, in 12 *Wheaton*, is directly contrary to our uniform law. I do not understand the idea of Chief Justice Marshall, when he says, " It never has been supposed that a subsequent mortgagee, could, by obtaining and executing a decree for the sale of mortgaged premises, obtain a precedence over a prior mortgage. If such a decree should be made without preserving the rights of the prior mortgagee, the property would remain subject to those rights in the hands of a purchaser." He supposes what cannot happen, and never will. On a sale by a chancellor, so far as I know, all the property is turned into money. What was a lien is paid in cash, and the purchaser who paid the cash, holds the land clear of all incumbrances. I am not aware that on a sale ordered in chancery, the purchaser must look to the application of the money; or ever took subject to any incumbrance, unless the sale was expressed to be made subject to such incumbrance. Before the sale, or before the money is paid out, all those interested have notice; so have they in this state. We are in the daily habit of hearing remarks, as to want of notice here, and the notice in chancery, which are strange. Actual notice is as much prescribed by our laws and usage, and as certainly given, as in any court on earth, where it is

(Presbyterian Corporation *v.* Wallace and others.)

possible to give it. Where parties are out of the jurisdiction of the court, notice is given to the counsel, or by advertisement, exactly as in chancery. It would seem, that many of our lawyers, having read that a chancellor calls all parties before him, take it literally, and really believe he sends to the East and West Indies, and to the sands of Africa, and snows of Siberia, to the north and to the south poles.

Every man is *bound* to attend to *many* things. If lands bound by his mortgage or his judgment are uncultivated, he had better inquire once in two years whether the taxes are paid, or his security may be gone by a sale for taxes. He had better attend to whether other judgments or mortgages are obtained against the same property, or they may be sold without his knowledge. To be sure, on the law, as here settled, there is as much certainty as there can be, that it will bring a fair price. There can be no sale without a suit, a judgment, an execution, an inquest, a *venditioni exponas*, and most public advertisements; this is repeated, and very public notice, and as it affects property out of the proceeds of which he is to get the money, is given for his benefit, and he is bound to attend to it. After the sale, the money comes into court; the records are examined; his lien is known; actual notice is given him if within the process of the court; if not, the only possible notice is by advertisement, precisely as in chancery. There are very many things which must be attended to or lost. A merchant must protest his bill, and give notice; a simple contract debt must be sued within six years; a judgment revived within five; a bond and mortgage sued within twenty or twenty-one; an estate in fee simple not neglected twenty-one, and taxes on unseated lands paid within two years, or the land is gone; and there is no body to give notice of these things. Every man is bound to know and to attend to all that is by law incident to his estate or his rights, whether real or personal, in possession or in action, and must submit to the consequences of negligence. The business of the world cannot stand still, for those who are negligent or distant. After the publication of notice, partition of the lands may be made in the absence of some of the parties; intestate's estates may be divided in the same way, and in both cases, if the property cannot be divided, it will be sold, and the share of the money preserved for those who are absent. Of all wakeful animals, perhaps, your money lending man is the most vigilant. It occurs one hundred times that securities are unavailing, for want of protest and notice, or by operation of some of the statutes of limitations, for once that property is sold without the actual knowledge of the creditor who has the prior lien. Why should a single instance of the latter kind, if ever one did happen, occasion as much alarm as an earthquake? Why must the business of all the rest of the world be stopped or deranged for one alleged occurrence of this kind? The case of *Willard* v. *Norris* was but a three hundred dollar matter, and even there although the bank of *Pennsylvania*, or its directors did not hear of the sale, their duly constituted attorney in fact (*John Morris* Esq. of *Wellsborough*) was present at it. I conversed

with him about the levy and judgment some months before the sale. The fact is, an ejectment on a title entirely adverse had been brought, and a judgment by default obtained on it; and this, and this only prevented the property from selling for enough to pay the judgment and mortgage both.

But an ejectment can be brought by the mortgagee. This has been decided, and I am sorry for it. It is in the face of the spirit of the act of 1705, and of the letter and spirit both of the act of 21 *March,* 1806, but it proves nothing. Until since 1815, it was usual to bring one for a legacy charged on land against the devisee ; and now if land is devised to *A.* to be sold, and the price given to *B. C.* and *D.*, and *A.* does not sell, *B. C.* and *D.* can bring ejectment and recover it from him. Nay, by the express direction of the act of 1705, if the rents would pay the debt in seven years, it could not be sold, and the judgment creditor could recover in ejectment, and hold till paid, and had to bring ejectment until the act of 13 *April,* 1807, directed the sheriff to deliver the possession on the *liberari facias.* The fact is, that ejectments are still resorted to in this state in more cases than are necessary ; and were once used in several, which are now abandoned. Either the courts will cease sustaining them on mortgages, in obedience to existing laws, or the legislature must again interfere. Ejectment is seldom used on a mortgage, except for purposes of oppression.

By the act of 2d *April,* 1822, the morgagee may release any part of the mortgaged premises to the mortgagor, or his heirs, executors, administrators, or assigns, or any person claiming under him, or them, and may proceed to collect the *debt,* or demand mentioned in the said mortgage, or so much thereof as remains due from the residue of the mortgaged premises ; and the *defendant* or defendants in such *scire facias* in addition to the pleas under the former acts, may plead, that the balance claimed is greater than, in a just proportion, ought to be levied out of the premises described in such writ; and if he or they confess judgment for what they allege is a just proportion, and the plaintiff will proceed, and does not on the final judgment recover more, the plaintiff shall pay the costs.

I consider, that although the plaintiff in this suit might have demanded his whole money from the proceeds of the first sheriff's sale, and after that a proportion at least from each succeeding one, yet it will be more consonant to justice and equity to consider his neglect to apply in each case as equivalent to a release of the part then sold, and by a liberal construction of this act, as having recourse to the remaining parts of the mortgaged premises for the proportion, which each ought to pay.

I also think the plea allowed by this act, is given not universally, and in every possible case, *e. g.* if the mortgagor still owns all the lands, and a part is released, he may still be liable to have the whole mortgage collected from the remaining lands ; but if he has aliened part or parts of the premises, and the mortgagee, after this, releases

any part, he discharges the parts sold, and all the parts sold, whether to the first or a subsequent purchaser, from paying more than what a jury shall say, is a just proportion between the part sold and the whole mortgaged property of the whole mortgage debt.

It will be observed, that I have spoken of mortgages for the payment of a definite sum of money. Those to secure a yearly provision in grain or money, to a person for life, or such cases, were not before the court, and to such my observations do not apply. The same may be said of such incumbrances by will or otherwise. I have said nothing of any such.

I am then of opinion, that all such parts of the mortgaged premises as have been sold on execution, are held by the purchasers discharged from this mortgage, and that the part never sold on execution, remains liable to the plaintiff for its proportion of the amount of the money secured by the mortgage.

It was contended, that this last was exempted from liability, because it was sold first in point of time by *Cox,* who purchased the whole lots from *Wallace* the mortgagor. The doctrine of contribution in such case, is an important point in the law in this state. At common law, in *England,* where the debtor in a judgment or recognizance aliened part of the lands bound, such lands were not taken in execution until a *scire facias* had issued; and if one of the purchasers alleged that other lands liable to execution were in the hands of persons on whom the *scire facias* had not been served, he was bound to plead it, and they were brought in; and as the debt was collected, not by sale of the lands, but from the rents on an extent on elegit, each thus contributed at once to the payment of the debt. The debtor himself could not, nor could his heirs or devisees have purchasers brought in; but co-heirs were liable to be brought in, for they held in equal right. So purchasers, though sued merely as terre-tenants, could bring in the debtor himself, or his heirs, or other purchasers, even though some of them were in another county. 3 *Co.* 11. *Moore,* 429. 2 *Ventris,* 104, 105. There is not a word in these cases, or any other case I have found, pointing to a difference between successive purchasers, and many to be found which show there is no difference. 5 *Viner,* title *Contribution,* pl. 3. If a man be bound in a recognizance and die, then as long as the heir has assets execution shall be against the heir only; but if the heir has no assets, execution shall be *on all the terre-tenants,* and every one shall be contributary to the other; and cites *Broke on Fitzherbert, Execution,* 139, pl. 6. So where the feoffee of the conusor is in execution, he shall have contribution against *every* other feoffee of the same conusor; and cites *Broke,* tit. *Suit,* pl. 12, and the *Year Books.* And pl. 13: If the king's tenant *aliene to several,* severally, and the king distrain the one for the whole, he shall have contribution of the others.

In 2 *Saunders,* 6, *Jeffreson* v. *Morton,* and the notes, we find the doctrine on this subject somewhat at large. In page 9, Serjeant *Williams,* after reviewing the authorities, says, the reason of the plea

seems to be, because *every* tenant of the land is entitled to have contribution, that is, *all the lands* of the conusor or the defendant to the judgment; in the hands of the several purchasers, must be extended and equally charged. Therefore, unless *all* the tenants be warned, the others are not obliged to answer: and he cites many authorities. Although I have not been able to find a distinction between the first and subsequent purchasers from the defendant in the judgment in the old authorities, there are some cases sanctioned by judges of great learning and industry, which make such distinction, and I proceed to notice them.

*Cheeseborough* v. *Millard,* 1 *Johns. Ch.* 409, is the first case of contribution I find in the reports of *New York.* In that case the parties on one side were purchasers at the sheriff's sale under the same judgment and execution, and probably bought on the same day; no distinction is made between them. They were ordered to contribute to discharge a prior mortgage, in proportion to the real value of their respective purchases, and not in proportion to the price at sheriff's sale. " The object of the principle of contribution," says the chancellor, " is equality in support of a common burden, and the law upon this point is grounded upon great equity."

In the same book, page 426, we find, *Cooper* et al. v. *Stevens.* In this case *Cooper* sold to *Richardson* six lots in different towns in *New York,* and took a mortgage for the price. *Richardson* sold No. 82 to *Stevens.* Afterwards *Richardson* sold four other lots, and *Cooper* released them, and took *Richardson*'s bond for their proportion, or what was supposed to be such. *Cooper* afterwards assigned the mortgage to *Hammond,* who insisted on collecting the whole amount from the owners of No. 82 and of 72. There was some evidence of parol agreements which the chancellor laid out of the case, and proceeded to decree that the release of the four lots, rateably reduced the power of the owner of the mortgage upon the remaining two lots, inasmuch as it deprived the owners of those two lots of their right of contribution as against the lots so released. Now if the lot first sold by the mortgagor was discharged, the owner of the lot No. 82 would not have been compelled to pay any thing: but it is said, " It is a doctrine well established, that when land is charged with a burden, the charge ought to be equal, and one part ought not to bear more than its due proportion; and equity will preserve this equality by compelling each part to pay its due proportion (3 *Co.* 14. 3 *P. Wms.* 98, 99.) I need not go at large into the doctrine; it is perfectly well understood," &c. &c. " Here the mortgagee has deprived the owners of lots 82 and 72 of recourse to the other lots, by previously discharging the other lots; and he ought not then in equity to charge them with a greater burden than they would have been subject to upon the principle of contribution, if no such discharge had been made." And he directed the master to ascertain the value of each lot at the date of the mortgage, and the owners of 82 and 72 to be discharged on payment of the proportion due on those lots, &c.

At page 447 of the same book, we find *Gill* v. *Lyon* and others, and a cross bill. In 1806, *Wilson* sold a tract of land to *Wells*, and took a mortgage for the purchase-money; recorded the day of its date. The same year *Wells* sold part of the land to *Lyon* and others, and covenanted to indemnify against incumbrances. In 1807, sundry judgments were obtained against *Wells*, and the residue of the tract was taken in execution, and sold to *Gill.* *Wilson* was proceeding to foreclose his mortgage against all the lands, and *Gill* and *Lyon* each brought bills in chancery against the other, *Gill* insisting on contribution against *Lyon*, and *Lyon* insisting that *Gill* should pay off the whole mortgage, and that the proceedings of *Wilson* should be staid against him. The chancellor says, the mortgage ought justly to be borne by the lands purchased by *Gill*, if sufficient to satisfy it. The doctrine of contribution does not apply, as between *Lyon* and the other purchasers from *Wells* on the one part, and *Gill* on the other, because their equity is not equal. *Lyon* and the others purchased for the full value, and under a covenant from *Wells* against incumbrances, and *Wells* had become insolvent. *Gill* afterwards purchased only the equity of redemption remaining in *Wells*, and with a full knowledge of the conveyance to *Lyon* and others, and has no just claim for contribution; and decreed that what was purchased by *Gill* should be first sold, and if that did not satisfy the mortgage, then the part purchased by *Lyon* and others, unless they paid the balance due. This decree seems to turn on the nature of the contracts, and to draw a distinction between a purchaser who knows of an incumbrance, and takes a covenant against it, and one who knows of it, and takes no such covenant, or buys at a sheriff's sale, in which there is no warranty of any kind. Of the soundness of the distinction as a defence against prior incumbrances, or as to contribution between themselves, I doubt. If it exists at all, it must be on the ground that the latter, by implication, must be supposed to have agreed to pay off the incumbrance, in addition to the price given to the seller. It is true the chancellor says, *Gill* purchased the estate of *Wells*, and no more, and *Wells*, if he had extinguished the mortgage, would have had no claim to contribution against his own vendee.

In 5 *Johns. Ch.* 235, is the case of *Clowes* v. *Dickerson*, in which, also, a man owning lands incumbered by mortgages and judgments, sold two lots in *Troy*, Nos. 241 and 242, to *Clowes*, and conveyed them by deed, with a clause of warranty against incumbrances. Soon after, all the other real estate of that vendor was sold at sheriff's sale, expressly subject to all incumbrances, and purchased by *Dickerson* and three others jointly. It was shown in proof, that the amount of all incumbrances was known at the sale, and that the property was notoriously worth double the amount bid, and the amount of the incumbrances. *Dickerson*, instead of paying off the incumbrances, purchased a judgment prior to the sale to *Clowes*, and by execution on it, sold the two lots of *Clowes*, and purchased them himself. The bill was to be relieved from this sale; and the chancellor puts it expressly

(Presbyterian Corporation *v.* Wallace and others.)

on the ground that *Dickerson* was the subsequent purchaser to *Clowes* and on that account liable to pay the prior incumbrances, and not upon what I conceive was stronger ground, that he agreed at the time of his purchase, to pay those prior incumbrances. He got the vendor's property at a lower price on that account, and most unjustly attempted to take other property for nothing; for having agreed to pay prior judgments, the moment he bought a prior judgment, it was paid, he being payer and payee.

It is, in terms, also laid down in this case, that chancery would interfere to prevent a judgment creditor from selling lands in the hands of a vendee of the debtor, until he sold all the lands of the debtor, and also from selling lands of a prior purchaser from such debtor, until he had sold all in the hands of subsequent purchasers from the same debtor. Either the general expressions, in this case, are to be taken to apply to the cause trying, or they are contrary to the case of *Cooper* v. *Stevens,* first cited; to *Hays* v. *Ward,* in 4 *Johns. Ch.* and to 7 *Johns. Ch.* 212. and other cases.

In 4 *Johns. Ch.* 135, it is said, after an examination of all the cases, the court cannot interfere to prevent a creditor from collecting his debt from him who is the real debtor, or the surety; from him who is primarily or ultimately liable, unless there are some special circumstances to justify its interference. And in 7 *Johns. Ch.* 212, lands bound by a judgment, were sold in 1813, and other lands afterwards, sold up to 1816. The first purchaser brought a bill, praying that the judgment should, as to him, be cancelled, and declared satisfied; if not, that the premises owned by him should be discharged, on paying a rateable proportion, or that the judgment be assigned to him, so that he may compel the owners of other lands, bound by it, to pay a just proportion; and that the judgment creditor be enjoined from selling his lands at present. All this was refused; because the other purchasers were not before the court. The judgment was not ordered to be assigned by way of substitution, on payment of it, because no right, or extent, or amount of contribution could be ascertained. Now by *Clowes* v. *Dickerson,* the last purchase was to be totally taken, and so on backwards until the debt was paid. It is further said, such a direction would only lead to other suits in chancery, by others, on whom the plaintiff might levy the whole, or an undue proportion of the judgment; and, finally, that as the defendant, the judgment creditor, had done nothing but prosecute his lawful rights, the bill was dismissed with costs. Surely, then, the previous cases were decided on the other grounds, and not on priority of purchase from the debtor; or the chancellor had changed his opinion.

In 9 *Wheaton,* 500, *Hughes* and others v. *Edwards,* a man mortgaged sundry lots in *Lexington,* to secure a debt. He afterwards successively sold the lots, or some of them, and they were highly improved. A bill to foreclose was brought against the mortgagor and the terre-tenants. Among other things, they asked an apportionment of the debt rateably among them. It was decided, a court will not stop

the mortgagee, till the proportion to be paid by the purchasers from the mortgagor, is settled. The mortgagee has a right to a foreclosure and sale of all the mortgaged property, *whether in possession of the mortgagor, or of those to whom he had sold.* If either of the defendants should pay more than his proportion of the debt, according to the relative value of the property he possesses, that is a matter to be settled among themselves; but it would be idle to force the mortgagee into the delay and expense incident to the settlement of differences between those with whom he has no concern. The conveyances to them by the mortgagor, are void as to the mortgagee, against whom they have no right, except that of redeeming, on payment of the mortgage debt and interest. It did not occur to the counsel or the court that the first who purchased, was safe until the lots of the after purchasers were sold; or, rather, the court decided the law was not so; and that they could not interfere, to order the sales to be effected, so as to produce a greater burthen on the last, than on the first who purchased from the mortgagor.

I would here leave this part of the subject, but *Nailer* v. *Stanley,* 10 *Serg. & Rawle,* 450, has been cited, and relied on; and to be sure, the judge who delivered the opinion of the court, after deciding that the form of the action was wrong, cites and approves of the cases of *Gill* v. *Lyon,* and *Clowes* v. *Dickerson,* above noticed. I would observe this point had not been argued; no cases had been cited; the industry of the judge found these two. I shall not, in this case, attempt a discussion of the general question, and the remedy in this state; it is enough that this is not the case there decided, but within the very exception there made.

"The debt," says Judge Duncan, quoting the words of Chancellor Kent, "is only the personal obligation of the debtor, and the charge on the land is by way of security, and is not analogous to a rent charge, which grows out of the land, and when any purchaser of a distinct part charged with the rent takes it, he takes it with such proportionable part of the rent. The owners of land in that case, stand equal, and if the whole rent be levied on one, he shall be eased in equity by contribution from the rest of the purchasers." 1 *Eq. Ca. Ab.* 112, *et seq. Carey's Rep.* 132.

It is often said in the *English* books, that the debt is the personal obligation, and the land the security. In *England,* land cannot be sold on a judgment, and the person of the debtor may be imprisoned, though he owns all the land in a county. Here land can be sold for debt, and must be sold before the body of the debtor can be confined. The creditor inquires as to the lands of the man he is about to trust. He gets a judgment, and that, by law, binds the lands; credit is given on the lands, and the remedy which the law gives against them, and this is universally known, and has been often repeated by judges; and by none more explicitly than by Judge Duncan. The same lien which a judgment gives on all the lands in the county, a mortgage gives on the lands comprised in it. There is some difference in the

(Presbyterian Corporation *v.* Wallace and others.)

remedy. On the judgment, you may sell chattels, any lands of the debtor, and finally take his person. On the judgment or mortgage, chattels cannot be taken, no other lands than those comprised in it, and the person never, perhaps, not even for costs. The debt on the mortgage when suit is brought on it, must come from the land, and the land only, more strictly than a rent charge. Whoever then buys any part of the mortgaged premises, takes that part subject to the mortgage, or a proportionable part of it. The mortgagor can by no act of his, discharge any part of it, or in any degree destroy the lien of the mortgagee, or vary or modify his remedy: the mortgaged premises and every part of them are, in the language of the Supreme Court of the United States, equally liable, whether in the hands of a purchaser from the mortgagor, or of the mortgagor himself. If he aliens to ten successive purchasers, the first and the last, equally gets the land subject to the mortgage ; and if it is sued, *every one,* in the language of Lord *Coke* in his " note Reader" in *Herbert's Case,* shall be contributors. " *Hoc est,* the *land of every terre-tenant* shall be extended."

And in chancery where the queen's grantee of a recognizance sought to extend the lands of the defendant, whereas there were divers other lands of great value in other men's hands liable to the said recognizance, it was ordered, that no *liberate* go out upon the said extent, until the court order the same. *The Queen* v. *Colburn, Carey's Reports,* 159. See also the same book, page 132.

It remains to notice the case of the purchase by Mr. *Pepper,* of the two lots sold on his own judgments, of which lots some part was comprised in the mortgage now in suit; and on the fullest consideration, I can neither find, nor on principle make, any distinction between his case and that of any other person, who had purchased the same lots, and paid the price to the sheriff, who instead of paying a proportionable part to the plaintiff, paid the whole money to Mr. *Pepper.* What is here settled, and what I have endeavoured to show, was always the law, is, that the purchaser at the sheriff's sale takes the property purchased clear of all incumbrances. By the law, and the practice, he must pay the price at farthest on the return of the writ, and before he gets his deed ; it is impossible for him to look to the application of the money, for it is taken from him. The sheriff must pay it into court; if not, he pays it to any claimant at his own risk. If he returns the property sold, and makes, and delivers the deed, he is liable for the money, and must pay it, whether he ever has, or ever will collect it. There is no privity between any of the lien creditors and the purchaser ; none of them can sue the purchaser. The title of the purchaser does not and cannot depend on the proper application of the money by the sheriff; it did not at common law on the sale of chattels. *A.* put an execution into the hands of the sheriff, and afterwards *B.* put a second execution into the hands of the same sheriff, who levied it, and sold the goods to *B.* This was soon after the statute, which enacted, that

(Presbyterian Corporation *v.* Wallace and others.)

chattels should be bound from the delivery of the writ to the sheriff; and the sheriff again took the goods on the writ of *A.* sold them, and *B.* brought trover, and recovered. 1 *Comyn's Rep.* 34, and the same case, though not so fully reported, 1 *Salk.* 320. 5 *Mod.* 377. 1 *Ld. Ray.* 251. *Holt,* 303, and the same point, 12 *Johns.* 162.

The owners of younger judgments frequently have an interest, that the land shall bring a fair price, and often become purchasers. When such pay their money, the law vests the property in them; and there can be no difference, between whether the sheriff and purchaser exchange receipts, or the purchaser pays the money, and the sheriff pays it back to him or to any other creditor not by law entitled to it. See also 1 *Rawle,* 302. 1 *Penn. Rep.* 240.

The case before cited of the *Commonweath* for the use of *Gurney's Executors* v. *Alexander,* in 14 *Serg. & Rawle,* 257, is an express decision on this point. *Park,* the purchaser was a judgment creditor, before whom were many judgments, the first of which was *Gurney's.* This court held, that the general law is, that the sheriff was liable; whether in that case, on circumstances, is another matter. The opinion is express, however, that the purchaser held the land clear of all prior judgments: in point of fact, a large part of it went to *Park* himself. I speak of cases where all is fair and no collusion between the sheriff and purchaser.

My opinion then is, that the several purchasers who bought parts of the mortgaged premises, of whom Mr. *Pepper* was one, hold the land discharged from this mortgage. That as to such of those parts *where the* money was brought into court, and paid away on the order of the court, the sheriff who paid it in, is not liable. Where it was paid by the sheriff without such order, the sheriff is to be resorted to for such proportion of the purchase money, as shall be found due from that part of the mortgaged premises embraced by such sale. And that the property purchased by *Stewart,* and never sold by the law, remains liable for such proportion of the debt due on the mortgage, as shall be rated to its comparative value with the whole property mortgaged.

Judge Ross was of opinion, that the property was still subject to the mortgage, notwithstanding the sale on younger judgments or mortgages. But if not so subject, then that the part never sold by process of law, remained liable to its proportion in the hands of the vendee of the mortgagor, without regard to whether he was a first or subsequent purchaser from the mortgagor, and that if those purchasing at the sheriff's sale on younger judgments or mortgages, held clear of the oldest mortgage, the plaintiff in such younger judgment or mortgage, purchasing at such sheriff's sale, held it as a third person, being a purchaser, would have done, and then the situation of *Pepper,* and the other purchasers was the same.